[No. S043578. Dec. 29, 1995.]

CITIZENS FOR COVENANT COMPLIANCE et al., Plaintiffs and
Appellants, v.
JARED A. ANDERSON et al., Defendants and Appellants.

**COUNSEL**

Wilson, Sonsini, Goodrich & Rosati and Debra Summers for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, Jamee Jordan Patterson, Deputy Attorney General, William M. Pfeiffer, Steven A. Sokol,

Sonia M. Younglove, Miller, Starr & Regalia, Harry D. Miller, Rutan & Tucker and Anne Nelson Lanphar as Amici Curiae on behalf of Plaintiffs and Appellants.

Roger Bernhardt, Cooley, Godward, Castro, Huddleson & Tatum, Kenneth J. Adelson, Benjamin K. Riley and Yvonne Gonzalez Rogers for Defendants and Appellants.

Stephen Cavellini as Amicus Curiae on behalf of Defendants and Appellants.

## OPINION

**ARABIAN, J.**—The Andersons want to plant and harvest grapes, operate a winery, and keep llamas on their property in Woodside. Some neighbors object, and claim such activities are prohibited by covenants, conditions and restrictions (CC&R's) that limit the Andersons' property, and theirs, to residential use. The Andersons counter, thus far successfully, that the CC&R's are not enforceable because they are not mentioned in any deed to their property. The dispute is now before us.

Its resolution requires us to penetrate a legal thicket entangled by the ancient doctrines of convenants that run with the land and equitable servitudes. The task is not easy. "The law of easements, real covenants, and equitable servitudes is the most complex and archaic body of American property law remaining in the twentieth century." (French, *Toward a Modern Law of Servitudes: Reweaving the Ancient Strands* (1982) 55 So.Cal.L.Rev. 1261.) Another commentator uses stronger language: "The law in this area is an unspeakable quagmire. The intrepid soul who ventures into this formidable wilderness never emerges unscarred. Some, the smarter ones, quickly turn back to take up something easier like the income taxation of trusts and estates. Others, having lost their way, plunge on and after weeks of effort emerge not far from where they began, clearly the worse for wear. On looking back they see the trail they thought they broke obscured with foul smelling waters and noxious weeds. Few willingly take up the challenge again." (Rabin, Fundamentals of Modern Real Property Law (1974) p. 489.)

It is, however, necessary to take up the challenge. *In vino veritas.* Although the relevant doctrines go back centuries, they are more vital than ever today as California becomes increasingly crowded and people live in closer proximity to one another. Planned communities have developed to regulate

the relationships between neighbors so all may enjoy the reasonable use of their property. Mutual restrictions on the use of property that are binding upon, and enforceable by, all units in a development are becoming ever more common and desirable. We recently confronted the question of what restrictions may reasonably be imposed in a condominium setting. (*Nahrstedt* v. *Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361 [33 Cal.Rptr.2d 63, 878 P.2d 1275].) This case addresses an earlier step in the process, considering how a general plan of restrictions is created in the first place.

The CC&R's of this case were recorded before any of the properties they purport to govern were sold, thus giving all buyers constructive notice of their existence. They state they are to bind and benefit each parcel of property as part of a planned community. Nevertheless, the Court of Appeal held they are not enforceable because they were not also mentioned in a deed or other document when the property was sold. We disagree, and adopt the following rule: if a declaration establishing a common plan for the ownership of property in a subdivision and containing restrictions upon the use of the property as part of the common plan is recorded before the execution of the contract of sale, describes the property it is to govern, and states that it is to bind all purchasers and their successors, subsequent purchasers who have constructive notice of the recorded declaration are deemed to intend and agree to be bound by, and to accept the benefits of, the common plan; the restrictions, therefore, are not unenforceable merely because they are not *additionally* cited in a deed or other document at the time of the sale.

We therefore reverse the judgment of the Court of Appeal.

## I. THE FACTS

Defendants Jared A. and Anne Anderson (the Andersons) own two adjacent parcels of property in Woodside that were part of separate subdivisions developed at different times.

One parcel was part of Skywood Acres, created in the 1950's when Joseph and Claire Stadler subdivided land into some 60 residential building lots. On June 5, 1958, an instrument entitled "Declarations Imposing Covenants Restrictions and Agreements Affecting . . . Skywood Acres," executed by the Stadlers, was recorded in San Mateo County. It states that the Stadlers owned the property, the map of which had previously been recorded, and expresses their "desire to establish a general plan for the improvement and

development of said property and to subject said property to the following conditions, restrictions, covenants and reservations upon and subject to which all of said property shall be held, improved and conveyed . . . ." Numerous restrictions follow, the first of which is that each lot "shall be used for residential purposes only." The instrument provides that "Dogs, cats, hares, fowls and fish may be kept as household pets provided they are not kept, bred or raised for commercial purposes or in unreasonable number," and allows keeping horses on specified lots under certain conditions. It also states, "All these conditions and restrictions shall run with the land and shall be binding upon all parties and all persons claiming under them . . . ." It further provides that, as to the Stadlers and "their grantees and successors in interest of any lot or lots" in the subdivision, the conditions are to be "covenants running with the land" enforceable by "the Subdividers, grantees or assigns, or by such owners or successors in interest."

The portion of Skywood Acres involved here was sold on October 14, 1958, and, after intermediate conveyances, was eventually acquired by the Andersons. Neither the original grant deed nor any other deed in the chain of title leading to the Andersons refers to the recorded restrictions. The Andersons' title insurance report, however, identifies the Skywood Acres CC&R's.[1]

The second parcel was part of the Friars subdivision, comprised of four lots. On January 24, 1977, the Town of Woodside adopted a resolution approving the parcel map for the subdivision upon certain conditions, including that the developer submit to the town attorney for approval "the convenants, conditions and restrictions applicable to this land division." On May 10, 1977, a "Declaration Imposing Covenants, Restrictions, Easements and Agreements," executed by the owner, was recorded.

This declaration describes the property in the subdivision and states that the owner desired and intended "to subject [the property] to certain conditions, covenants and charges between them and all subsequent purchasers . . . ." It declares that the property "shall be conveyed subject to the conditions, convenants and charges" set forth, including that the property is to be used solely for single family residences, and specifically "exclude[s]

---

[1]The Skywood Acres declaration refers to "covenants, restrictions and agreements," rather than covenants, conditions, and restrictions, or CC&R's. Nevertheless, for the sake of simplicity and clarity, we will refer to both declarations of restrictions of this case as CC&R's, in accordance with common usage. (See, e.g., *Nahrstedt* v. *Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at p. 369.)

every form of business, commercial, manufacturing, or storage enterprises or activity . . . ." Keeping animals other than household pets and horses is prohibited. The restrictions "are declared to constitute mutual equitable convenants and servitudes for the protection and benefit of each property in the said subdivision," and "are to run with the land." Moreover, "Each grantee of a conveyance or purchaser under a Contract or Agreement of Sale by accepting a Deed or a Contract of Sale or Agreement of purchase, accepts the same subject to any of the covenants, restrictions, easements and agreements set forth in this Declaration and agrees to be bound by the same." The owner of any of the parcels may enforce the restrictions.

The portion of the Friars subdivision involved here was sold two days after the CC&R's were recorded, and eventually was acquired by the Andersons at a foreclosure sale. The original deed refers to the parcel map, but not to the CC&R's. No other deed in the Andersons' chain of title refers to them. The title insurance report for this lot, purchased by the original buyers, identifies the Friars CC&R's.

The parties agree that both subdivisions were "developed from a general plan of uniform development." Both sets of CC&R's contain provisions regarding possible modification and termination of the restrictions. The record does not indicate whether any other deed to property in either subdivision mentions the CC&R's.

After purchasing the two parcels of property, the Andersons entered into a limited partnership agreement with a company located in the Island of Guernsey in the United Kingdom to operate a winery under the name Chaine d'Or Vineyards. They have obtained permits from the Town of Woodside to grow grapes and produce wine on their property, subject to specified conditions. In addition, the Andersons have admitted to keeping seven llamas on the property as pets.

The plaintiffs, an unincorporated association named Citizens for Covenant Compliance and individual landowners representing both subdivisions (hereafter, collectively, Citizens), filed this action against the Andersons to enforce both the Skywood Acres and the Friars CC&R's, which, they claim, prohibit the wine business and the keeping of llamas. The superior court found the CC&R's unenforceable, and judgment was eventually entered for the Andersons. Citizens appealed.

The Court of Appeal affirmed. For "several reasons," it determined that the CC&R's are not covenants running with the land. It also found they are

not enforceable as equitable servitudes because no deed or other written instrument exchanged between a buyer and a seller refers to the CC&R's. For this reason, the court concluded, no parcel in either subdivision was "conveyed pursuant to an express, written, agreement that it was conveyed subject to a general plan of restrictions. Absent that, it is irrelevant that the Andersons may have had actual notice of the CC&R's."

We granted Citizens' petition for review.

## II. DISCUSSION

### A. *Background*

#### 1. *Covenants and Equitable Servitudes*

Modern subdivisions are often built according to a general plan containing restrictions that each owner must abide by for the benefit of all. "Ordinarily, a general plan of restriction is recorded by the subdivider grantor for the purpose of insuring the uniform and orderly development and use of the entire tract by all of the original purchasers as well as their successors in interest. The restrictions are imposed upon each parcel within the tract. These subdivision restrictions are used to limit the type of buildings that can be constructed upon the property or the type of activity permitted on the property, prohibiting such things as commercial use or development within the tract, limiting the height of buildings, imposing setback restrictions, protecting views, or imposing similar restrictions." (*Sain* v. *Silvestre* (1978) 78 Cal.App.3d 461, 466 [144 Cal.Rptr. 478], and quoted in *Fig Garden Park etc. Assn.* v. *Assemi Corp.* (1991) 233 Cal.App.3d 1704, 1707-1708 [285 Cal.Rptr. 303], fns. omitted.)

The CC&R's of this case contain such restrictions. The Andersons contend, however, that they never took effect because they were not referenced in any deed to their property. Citizens contends they are enforceable as either (1) covenants that run with the land, or (2) equitable servitudes, two doctrines of distinct lineage. The dual nature of the argument has substantially complicated the question. Indeed, the differing history, uncertain mutual interplay, and varying technical requirements of these doctrines help explain why the law in the area is "an unspeakable quagmire." (Rabin, Fundamentals of Modern Real Property Law, *supra*, p. 489.) One author states that the distinction between the doctrines "can best be understood as

an archaic survivor of the former separation of the courts of law and equity. Each type of court developed its own set of requirements for covenants to run with the land . . . . Unfortunately, the modern union of law and equity has not yet produced a unified law of covenants." (5 Powell on Real Property (1995) Covenants as to Use, § 670[2], p. 60-12, fns. omitted.) A detailed review of the history and elements of these doctrines is unnecessary but, given modern confusion and, among legal scholars at least, interest regarding the degree to which the doctrines remain separate, a brief overview is appropriate.

The first doctrine to develop was that of real covenants or, as generally stated in California, covenants that run with the land, which dates back at least to *Spencer's Case* (1583 Q.B.) 77 Eng.Rep. 72. (See 5 Powell on Real Property, *supra*, Covenants as to Use, § 670[2], p. 60-12.) A covenant is said to run with the land if it binds not only the person who entered into it, but also later owners and assigns who did not personally enter into it. (Civ. Code, § 1460;[2] *Scaringe* v. *J. C. C. Enterprises, Inc.* (1988) 205 Cal.App.3d 1536, 1543 [253 Cal.Rptr. 344].) In California, only covenants specified by statute run with the land (§ 1461), primarily those described in sections 1462 and 1468. However, prior to the amendments of section 1468 in 1968 and 1969, these sections were written and interpreted very narrowly. Under section 1462, a convenant that *benefits* the property may run with the land, but not one that *burdens* the property. Section 1468, as originally enacted in 1905, only applied to a covenant "made by the owner of land with the owner of other land," and not to a covenant between a grantor and a grantee. (*Marra* v. *Aetna Construction Co.* (1940) 15 Cal.2d 375, 377-378 [101 P.2d 490]; see generally, 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, §§ 490-491, pp. 667-669.) Because the convenants in this case are between grantor and grantee and burden the property as well as benefit it, they would not qualify as covenants that run with the land under these provisions.

Beginning with the 1848 English decision of *Tulk* v. *Moxhay* (1848 Ch.) 41 Eng.Rep. 1143, courts of equity sometimes enforced covenants that, for one reason or another, did not run with the land in law, and the separate doctrine of equitable servitudes arose. (See 5 Powell on Real Property, *supra*, Covenants as to Use, § 670[2], pp. 60-7 to 60-9.) California adopted this doctrine, and it accumulated its own body of rules. (E.g., *Werner* v. *Graham* (1919) 181 Cal. 174 [183 P. 945].) Because of the statutory limitations on covenants running with the land, at least before section 1468

---

[2]All further statutory references are to the Civil Code unless otherwise indicated.

was amended, California courts have "[t]raditionally" analyzed CC&R's under the doctrine of equitable servitudes. (*Scaringe* v. *J. C. C. Enterprises, Inc.*, *supra*, 205 Cal.App.3d at p. 1544; see also *Richardson* v. *Callahan* (1931) 213 Cal. 683, 686 [3 P.2d 927].)

In 1968 and again in 1969, section 1468 was amended to make covenants that run with the land analytically closer to equitable servitudes. Today, that statute applies to covenants between a grantor and grantee as well as between separate landowners. (*Scaringe* v. *J. C. C. Enterprises, Inc.*, *supra*, 205 Cal.App.3d at pp. 1543-1544.)[3] Covenants governed by the amended statute might run with the land even if they formerly would not. (*Id.* at p. 1544.) The amendments have been held to apply only to covenants postdating their enactment. (*Oceanside Community Assn.* v. *Oceanside Land Co.* (1983) 147 Cal.App.3d 166, 174, fn. 4 [195 Cal.Rptr. 14]; *Taormina Theosophical Community, Inc.* v. *Silver* (1983) 140 Cal.App.3d 964, 972, fn. 3 [190 Cal.Rptr. 38].) Thus, they would apply to the 1977 Friars subdivision but not to the earlier Skywood Acres; no matter how the current issue is decided, the CC&R's of the latter would remain enforceable, if at all, only as equitable servitudes.

Commentators have argued that covenants that run with the land and equitable servitudes should be, or possibly have been, merged into a single doctrine. (French, *Design Proposal for the New Restatement of the Law of Property—Servitudes* (1988) 21 U.C. Davis L.Rev. 1213, 1223 ["The conceptual identity between real covenants and equitable servitudes, and the courts' practical fusion of the two has been recognized for at least a quarter

---

[3]Section 1468 now provides in pertinent part: "Each covenant, made by an owner of land with the owner of other land or made by a grantor of land with the grantee of land conveyed, or made by the grantee of land conveyed with the grantor thereof, to do or refrain from doing some act on his own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee, runs with both the land owned by or granted to the covenantor and the land owned by or granted to the covenantee and shall . . . benefit or be binding upon each successive owner, during his ownership, of any portion of such land affected thereby and upon each person having any interest therein derived through any owner thereof where all of the following requirements are met:

"(a) The land of the covenantor which is to be affected by such covenants, and the land of covenantee to be benefited, are particularly described in the instrument containing such covenants;

"(b) Such successive owners of the land are in such instrument expressed to be bound thereby for the benefit of the land owned by, granted by, or granted to the covenantee;

"(c) Each such act relates to the use, repair, maintenance or improvement of, or payment of taxes and assessments on, such land or some part thereof . . . ;

"(d) The instrument containing such covenants is recorded in the office of the recorder of each county in which such land or some part thereof is situated."

of a century."]; Reichman, *Toward a Unified Concept of Servitudes* (1982) 55 So.Cal.L.Rev. 1177, 1186, 1230; Newman & Losey, *Covenants Running with the Land, and Equitable Servitudes; Two Concepts, or One?* (1970) 21 Hastings L.J. 1319.) Whether the amendments to section 1468 have accomplished this fusion in California is beyond the scope of the narrow issue before us. (But see *Soman Properties, Inc.* v. *Rikuo Corp.* (1994) 24 Cal.App.4th 471, 484 [29 Cal.Rptr.2d 427]; Note, *Covenants and Equitable Servitudes in California* (1978) 29 Hastings L.J. 545, 587-588.) Neither the previous statutes nor the current statutes answer this question, which involves how a covenant is created. But we see no difference regarding this issue between convenants that run with the land and equitable servitudes; the rule we adopt applies equally to both.

### 2. *Recording Provisions*

By statute, any instrument "affecting the title to . . . real property may be recorded" by the "county recorder of the county in which the real property affected thereby is situated." (Gov. Code, § 27280, subd. (a); Civ. Code § 1169.) "Recording consists of copying the instrument in the record book and indexing it under the names of the parties. (See Govt. C. 27257, 27322 et seq.)" (4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 200, p. 406.) Civil Code section 1213 provides that every "conveyance" of real property recorded as prescribed by law provides "constructive notice" of its contents to subsequent purchasers. The term "conveyance" is broadly defined to include *"every instrument* in writing . . . by which the title to any real property *may be affected* . . . ."* (Civ. Code, § 1215, italics added.) Constructive notice "is the equivalent of *actual knowledge*; i.e., knowledge of its contents is conclusively presumed." (4 Witkin, Summary of Cal. Law, *supra*, § 203, p. 408, italics in original.)

CC&R's, which affect title to real property, have long been recorded under these provisions. (See, e.g., *Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500, 504, 511-512 [131 Cal.Rptr. 381, 551 P.2d 1213] (*Riley*); *Scaringe* v. *J. C. C. Enterprises, Inc.*, *supra*, 205 Cal.App.3d at pp. 1540-1541, 1543-1544; and cases cited below.)

### B. *Analysis*

Two factual circumstances, and the interplay between them, are of paramount importance. First, the CC&R's were recorded before any of the property was sold, thus giving the Andersons notice of their existence.

Second, no written document executed at the time of any of the conveyances of the Andersons' properties refers to the CC&R's.

Properly stated, the issue here is not whether the restrictions run with the land, and thus bind successors as well as the original grantees, but *whether they ever took effect in the first place* so as to bind even the original grantees. Specifically, the issue is whether a purchaser is bound by previously recorded CC&R's even though none of the written documents executed at the time of the conveyance refer to them. This involves the question whether there is sufficient expression of *intent* on the purchaser's part to enter into the convenants. Although notice is relevant to our resolution of the issue, it is not the issue itself.

### 1. *California Cases*

In the 1919 decision of *Werner* v. *Graham, supra*, 181 Cal. 174 (*Werner*), a developer subdivided a tract and recorded a map of the tract. "This map showed no building lines or anything else to indicate any purpose of restricting in any way the manner in which the different lots might be built upon or otherwise improved or the uses to which they might be put." (*Id.* at p. 177.) He then sold the lots. The early deeds contained "restrictive provisions, which, while differing slightly in some instances, dependent upon the location of the particular lot . . . are yet so uniform and consistent in character as to indicate unmistakably that [the developer] had in mind a general and common plan which he was following." (*Ibid.*) The developer told the purchasers "that he was exacting the same restrictive provisions from all purchasers." (*Id.* at p. 179.) He later quitclaimed the property eventually purchased by the plaintiff. The deed to this property contained no restrictions. The issue was whether the restrictions placed in the deeds to the other property were also binding on the plaintiff.

The developer in *Riley, supra*, 17 Cal.3d 500, sold the property in dispute by a deed that contained no restrictions. "[A]t the time of the conveyance there was no document of record purporting to restrict the use of" the property. (*Id.* at p. 504.) Nine months after the conveyance, the developer recorded a document purporting to impose uniform restrictions on a number of lots, including the one in dispute. The issue was whether these restrictions applied to the lot sold earlier.

In both *Werner, supra*, 181 Cal. 174, and *Riley, supra*, 17 Cal.3d 500, we held the property was not bound by the restrictions. It is readily apparent that

both are factually distinguishable from this case. In *Werner*, there was no recorded document imposing uniform restrictions on the entire subdivision, only individual deeds imposing restrictions on specific parcels. In *Riley*, the restrictions were recorded *after* the conveyance at issue. Nevertheless, the Andersons cite some of the language of these decisions as aiding their position.

In *Werner, supra*, 181 Cal. at pages 181-182, we noted that the restrictions in the earlier deeds did not state that the land was part of a larger tract, that the restrictions were intended to benefit other land, or that the benefit was to pass to other land. "Servitudes running with the land in favor of one parcel and against another cannot be created in any such uncertain and indefinite fashion. It is true, the nature of the restrictions is such that, when considered in connection with the fact that [the developer] still retained the greater portion of the tract, it is not improbable that he exacted them for the benefit of the portion so retained. *But the grantee's intent in this respect is necessary, as well as the grantor's*, and the deed, which constitutes the final and exclusive memorial of their joint intent, has not a word to that effect, nor anything whatever which can be seized upon and given construction as an expression of such intent. *If such was their intent, it has not been expressed*." (*Id.* at p. 182, italics added.)

It made no difference in *Werner* that the developer "in all his deeds exacted similar restrictions and clearly had in mind a uniform plan of restrictions which he intended to impose, and actually did impose, upon all the lots in the tract as he sold them." (*Werner, supra*, 181 Cal. at p. 183.) We recognized that if the deeds contain "appropriate language imposing restrictions on each parcel as part of a general plan of restrictions common to all the parcels and designed for their mutual benefit, mutual equitable servitudes are thereby created in favor of each parcel as against all the others." (*Ibid.*) These mutual servitudes "spring into existence as between the first parcel conveyed and the balance of the parcels at the time of the first conveyance." (*Ibid.*) But, we stated, the "crux of the present case" was that "here there is no language in the instruments between the parties, that is, the deeds, which refers to a common plan of restrictions or which expresses or in any way indicates any agreement between grantor and grantee that the lot conveyed is taken subject to any such plan." (*Id.* at p. 184.)

We went on to explain the significance of these facts. "The intent of the common grantor—the original owner—is clear enough. He had a general plan of restrictions in mind. *But it is not his intent that governs*. It is the *joint* intent of himself and his grantees, and as between him and each of his

grantees the instrument or instruments between them, in this case the deed, constitute the final and exclusive memorial of such intent. It is also apparent that each deed must be construed as of the time it is given. . . . Nor does it make any difference that . . . [the developer] gave each grantee to understand, and each grantee did understand, that the restrictions were exacted as part of a general scheme. Such understanding was not incorporated in the deeds, and as we have said, the deeds in this case constitute the final and exclusive memorials of the understandings between the parties. Any understanding not incorporated in them is wholly immaterial in the absence of a reformation. [Citations.] This whole discussion may in fact be summed up in the simple statement that *if the parties desire to create mutual rights in real property of the character of those claimed here they must say so, and must say it in the only place where it can be given legal effect, namely, in the written instruments exchanged between them which constitute the final expression of their understanding.*" (*Werner, supra,* 181 Cal. at pp. 184-185, italics added.)

In *Riley, supra,* 17 Cal.3d 500, we relied on *Werner, supra,* 181 Cal. 174, in finding the later recorded restrictions not enforceable. We stressed the key fact distinguishing that case from this—that the restrictions of *Riley* were recorded *after* the conveyance—and stated that "quite apart from the rule of *Werner* v. *Graham,* it is manifest that acknowledgment and recordation of a declaration of restrictions by the grantor after the conveyance to plaintiffs cannot affect property in which the grantor no longer has any interest." (*Riley, supra,* 17 Cal.3d at p. 507.) We rejected the claim that parol evidence may be admitted to show that the parties in fact intended the property to be subject to restrictions like those later recorded, finding that the covenants must be in writing to be effective. "Every material term of an agreement within the statute of frauds must be reduced to writing. No essential element of a writing so required can be supplied by parol evidence." (*Id.* at p. 509.) A contrary rule, we said, " ' "would make important questions of the title to real estate largely dependent upon the uncertain recollection and testimony of interested witnesses. The rule of the *Werner* case is supported by every consideration of sound public policy which has led to the enactment and enforcement of statutes of frauds in every English-speaking commonwealth." ' " (*Id.* at p. 510, quoting *McBride* v. *Freeman* (1923) 191 Cal. 152, 160 [215 P. 678].) Therefore, there " ' "should be some *written* evidence" ' " indicating what property was affected by the restrictions. (17 Cal.3d at p. 510, quoting *Wing* v. *Forest Lawn Cemetery Assn.* (1940) 15 Cal.2d 472, 480 [101 P.2d 1099, 130 A.L.R. 120], italics added in *Riley.*) " ' "As a matter of policy, the understanding of the parties should be definite and clear, and should not be left to mere conjecture." ' " (*Ibid.*)

We also emphasized the importance of recording the restrictions. " '[T]he recording statutes operate to protect the expectations of the grantee and

secure to him the full benefit of the exchange for which he bargained. [Citations.] Where, however, mutually enforceable equitable servitudes are sought to be created outside the recording statutes, the vindication of the expectations of the original grantee, and for that matter succeeding grantees, is hostage not only to the good faith of the grantor but, even assuming good faith, to the vagaries of proof by extrinsic evidence of actual notice on the part of grantees . . . . The uncertainty thus introduced into subdivision development would in many cases circumvent any plan for the orderly and harmonious development of such properties and result in a crazy-quilt pattern of uses frustrating the bargained-for expectations of lot owners in the tract.' " (*Riley, supra,* 17 Cal.3d at pp. 511-512.)

In dicta, we also stated that *Murry* v. *Lovell* (1955) 132 Cal.App.2d 30 [281 P.2d 316], "a leading authority in the *Werner* line, makes clear that even if the restrictions here in question had been recorded prior to the issuance of plaintiffs' deed, no equitable servitude would have been created absent the inclusion of such restrictions, by recitation or incorporation, in the deed. Compare *Martin* v. *Holm* (1925) 197 Cal. 733 [242 P. 718], wherein the deed to defendants contained no restrictions but they took with record notice of a prior deed establishing reciprocal servitudes binding upon their grantor." (*Riley, supra,* 17 Cal.3d at p. 507, fn. 4; see also *id.* at p. 512.)

In both *Werner, supra,* 181 Cal. 174, and *Riley, supra,* 17 Cal.3d 500, there was no prior recorded document providing a common plan and stating that the restrictions were to apply to every parcel. The only documents in existence from which the mutual intent and agreement of the parties could be discerned were the deeds themselves, which were silent. No decision by this court invalidating restrictions involves a written plan, like that here, that was applicable to an entire tract and was recorded before conveyancing. However, some intermediate appellate decisions have concluded that for recorded uniform restrictions to take effect, they must at least be referenced in a deed or other instrument at the time of an actual conveyance. (*Stell* v. *Jay Hales Development Co.* (1992) 11 Cal.App.4th 1214, 1229-1230 [15 Cal.Rptr.2d 220]; *Scaringe* v. *J. C. C. Enterprises, Inc., supra,* 205 Cal.App.3d at pp. 1545-1547; *Trahms* v. *Starrett* (1973) 34 Cal.App.3d 766, 770-772 [110 Cal.Rptr. 239]; *Anderson* v. *Pacific Avenue Inv. Co.* (1962) 201 Cal.App.2d 260, 262-264 [19 Cal.Rptr. 829]; *Murry* v. *Lovell, supra,* 132 Cal.App.2d 30.)

In *Murry* v. *Lovell, supra,* 132 Cal.App.2d 30, for example, prior to any sales, the owners of a parcel of land to be subdivided recorded a document purporting to impose use restrictions upon the property. One of the original

owners testified that when he executed the deeds to the properties at issue, he "told each of [the buyers] about the restrictions and read to them a copy of the recorded declaration." (*Id.* at p. 32.) However, no deed mentioned the restrictions. The court concluded that the restrictions never took effect. It found that the owners "unquestionably had in mind that they would convey the various lots subject to the proposed equitable servitudes thereby evidenced, but, having gone that far, they had not as yet created any servitudes whatever. They were still the owners of the whole property and until and unless they made conveyances, which conveyances contained the provisions for equitable servitudes either by direct expression in the deeds or by reference to the recorded declaration of restrictions or other effective means of creating by the severance, and as a part of it, the equitable servitudes counted upon herein, those equitable servitudes would not arise. . . . We hold that, so far as the record here shows, no equitable servitudes existed." (*Murry* v. *Lovell, supra,* 132 Cal.App.2d at pp. 35-36.)

It has not taken much to satisfy the requirement of a reference in a deed. As little as a statement that the property is "subject to" restrictions of record (*Martin* v. *Holm* (1925) 197 Cal. 733, 740, 745 [242 P. 718]; *Soman Properties, Inc.* v. *Rikuo Corp., supra,* 24 Cal.App.4th at pp. 482-483; *Fig Garden Park etc. Assn.* v. *Assemi Corp., supra,* 233 Cal.App.3d at pp. 1709-1710), or even a "reference to restrictions 'of record, if any' " (*Oceanside Community Assn.* v. *Oceanside Land Co., supra,* 147 Cal.App.3d at p. 174) has been found to suffice. (But see *Russell* v. *Palos Verdes Properties* (1963) 218 Cal.App.2d 754, 767 [32 Cal.Rptr. 488] [indicating that "subject to" language is not enough to create convenants].) But to date, the Court of Appeal decisions have required some reference in the deed, however vague, to the recorded restrictions.

### 2. *The Current Uncertainties*

The Andersons argue that the CC&R's never took effect because they were not mentioned in the deeds to their properties. Under this interpretation, if the developer of a subdivision records a uniform plan of restrictions intended to bind and benefit every parcel alike, implementation of the plan depends upon the vagaries of the actual deeds, and whether they contain at least a ritualistic reference to restrictions of record. When, as may often be the case, some deeds refer to the restrictions, and others do not, the enforceability of the restrictions can hinge upon the sequence of the conveyances, and can vary depending upon what property owner seeks to enforce them and against which property.

For example, if the deed to the first conveyance refers to the restrictions, they might be effective at least as between that property and later properties,

even if the later deeds *do not* refer to them. "From the recordation of the first deed which effectively imposes restrictions on the land conveyed and that retained by the common grantor, the restrictions are binding upon all subsequent grantees of parcels so affected who take with notice thereof notwithstanding that similar clauses have been omitted from their deeds." (*Riley, supra,* 17 Cal.3d at p. 507; see also *Greater Middleton Assn.* v. *Holmes Lumber Co.* (1990) 222 Cal.App.3d 980, 990-991 [271 Cal.Rptr. 917].) Moreover, under this view, even if a deed fully and expressly incorporates the CC&R's, they would not be enforceable as to an earlier sale that did not contain such a reference. "But a grantee possessed of a dominant interest could not enforce the restrictions as to lots that were deeded without restriction . . . prior to the execution of the grantee's deed." (*Trahms* v. *Starrett, supra,* 34 Cal.App.3d at p. 771.) Thus, the rights and duties of a later purchaser as against earlier ones would not depend on any document executed at the time of the later sale, but solely on the language of *earlier* sales of *separate* parcels.

The results can be byzantine. One commentator has reviewed some of the possibilities: "If the subdivider fails to insert the agreement in the first deed but remembers to insert it in the fifth deed, for example, the equitable servitude springs into existence from deed five onwards. The restrictions do not apply to the first four lots because the subdivider no longer has any interest in those lots and cannot place a restriction on them in favor of the rest of the tract. If the subdivider inserts the agreement in deeds five and six and then fails again to put them in seven and eight, the courts have held that lot owners five and six can enforce the restrictions against seven and eight, but seven and eight cannot enforce them against each other. When the subdivider put the agreement in the deeds to lots five and six, he agreed to burden the rest of the unsold subdivision. When he sold lots seven and eight, the burden of his agreement passed as an incident to lots seven and eight in favor of lots five and six. There was no agreement between lot owner seven and the subdivider that the subdivider burden the rest of his tract in favor of lot seven. Thus when the subdivider conveyed lot eight, there was no burden to pass incident to the land in favor of lot seven. Lot seven can enforce the restrictions against lots five and six, however, because just as the burden of the agreement between the subdivider and five and six passed as an incident to lot seven, so should the benefit of that agreement pass. The subdivider had the benefit of enforcing the restrictions against five and six, and that benefit passes to seven.

"If the subdivider resumes placing the agreements in the deeds to lots nine and ten, lot owners seven and eight cannot enforce the restrictions against

nine and ten, and similarly nine and ten cannot enforce them against seven and eight. When the subdivider conveyed nine and ten, he no longer had any interest in seven and eight. He could neither impose a restriction on them in favor of anyone else nor confer a benefit on them." (Note, *Covenants and Equitable Servitudes in California, supra,* 29 Hastings L.J. at pp. 569-570, fns. omitted.)[4]

As the author plaintively asks, this analysis "may be logical, but is it equitable?" (Note, *Covenants and Equitable Servitudes in California, supra,* 29 Hastings L.J. at p. 570.) And, to ask an even more pertinent question, is it what *anyone* intended? Would anyone really intend a subdivision where the order in which property is sold determines what restrictions are enforceable, where some landowners are not bound by restrictions of record and cannot enforce them against anyone, where some owners can enforce them against some property but not others and not against each other, and where some landowners are bound by the restrictions as against some owners but not against others who would be powerless to enforce them?

This situation dramatically complicates title searches. Instead of simply searching for restrictions of record in order to know exactly what is being purchased, a prospective buyer must search the chain of title of all previously sold property in the tract. If the deed to the property in question refers to the restrictions, the search would have to determine which of the earlier deeds, if any, contain a similar reference, for the restrictions would be enforceable only against those and later parcels, and not against earlier parcels whose deeds did not refer to the restrictions. If the deed does not refer to the restrictions, the buyer would nevertheless have to conduct the same search, for any earlier sold property that *does* refer to them would have a mutual servitude against the later property whether or not the later deed mentioned it.

Moreover, it is not certain exactly what the law is on this subject. " 'When a declaration of restrictions is recorded which describes multiple lots in a subdivision, it is not clear whether the restrictions are enforceable against each lot in the subdivision merely by reference to the restrictions in the first deed to the first lot (the "first deed only" theory), or whether it is necessary that the restrictions be referred to in the first deed to each of the lots (the "all first deeds" theory).' " (*Soman Properties, Inc.* v. *Rikuo Corp., supra,* 24

---

[4]This hypothetical does not directly apply here, for none of the deeds to the Andersons' properties refers to the CC&R's. However, these possibilities are inherent in some of the Court of Appeal decisions. Similar questions could arise even regarding these subdivisions if some other deed in either subdivision does contain a reference, and someone else tries to enforce the CC&R's because of this reference.

Cal.App.4th at p. 485, quoting 7 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1990) Covenants and Restrictions, § 22.8, pp. 549-550.) It would appear that the "first deed only" theory is currently ascendant, but the "all first deeds" theory finds support in the cases. (E.g., *Wing* v. *Forest Lawn Cemetery Assn.*, *supra*, 15 Cal.2d at pp. 482-483; *Terry* v. *James* (1977) 72 Cal.App.3d 438, 444 [140 Cal.Rptr. 201].)

In short, the current state of the law creates the very "crazy-quilt pattern of uses" that we warned against in *Riley*, *supra*, 17 Cal.3d at page 512. Moreover, the quilt might have a shifting pattern depending upon whether the court follows the "first deed only" theory or the "all first deeds" theory.[5]

### 3. *The Solution*

These uncertainties can be eliminated by adopting the rule stated at the outset. In essence, if the restrictions are recorded before the sale, the later purchaser is deemed to agree to them. The purchase of property knowing of the restrictions evinces the buyer's intent to accept their burdens and benefits. Thus, the mutual servitudes are created at the time of the conveyance even if there is no additional reference to them in the deed. This rule has many advantages.

The first advantage is simplicity itself. One document, recorded for all purchasers to review, would establish the rules for all parcels, not many documents that may or may not be mutually consistent. There would be no bewildering mosaic of enforceability and nonenforceability. "The rules of law about covenants running with the land are so complex that only a very few specialists understand them. Sometimes complexity in the law is necessary. In this particular case, it is not. If the cases in this area were solved by reference to the underlying policies instead of by reference to outworn precedent, the rules would be reasonably simple to state and the results more consonant with a sound system of private land use control." (Berger, *A Policy Analysis of Promises Respecting the Use of Land* (1971) 55 Minn. L.Rev. 167, 234; see also Reichman, *Toward a Unified Concept of Servitudes*, *supra*, 55 So.Cal.L.Rev. at pp. 1259-1260.)

A rule allowing the uniform implementation of a general plan from the outset of the development would be good policy, which no doubt helps

---

[5]Amicus curiae California Association of Realtors argues in support of Citizens that, in practice, title searches generally do not encompass first deeds of other properties in the tract, and that the deeds are signed only by the seller and delivered to the buyer weeks *after* close of escrow, thus making them doubtful evidence of the actual intent of the parties. These assertions, if correct, would support our holding. However, the record does not demonstrate these facts, and we therefore do not rely on them in reaching our conclusion.

explain the modern trend in the cases of accepting as sufficient the slightest reference in the deeds to restrictions of record. Although servitudes go far back into history, "Private land use arrangements are increasingly common and useful in the modern world." (French, *Toward a Modern Law of Servitudes: Reweaving the Ancient Strands, supra,* 55 So.Cal.L.Rev. at p. 1318.) "In modern times, covenants are most often used in situations where they effectively regulate land uses, such as subdivisions, in the same manner as zoning laws. In these circumstances, running covenants generally enhance alienability, and therefore many authorities feel that they should be encouraged." (5 Powell on Real Property, *supra,* Covenants as to Use, § 673[1], p. 60-46, fn. omitted; see also Newman & Losey, *Covenants Running with the Land, and Equitable Servitudes; Two Concepts, or One?, supra,* 21 Hastings L.J. at p. 1323.) "No longer is there any reason to believe that the average American buying into a residential development would 'protest vigorously against being compelled to perform promises he has never made.' [Fn., citing 'Restatement of Property, Intro. Note at 3156 (1944).'] Since financial viability of the community depends on continued covenant compliance by all, the average buyer is more likely to protest if others in the development are permitted to escape performance of the covenants made by their predecessors." (French, *Design Proposal for the New Restatement of the Law of Property—Servitudes, supra,* 21 U.C. Davis L.Rev. at p. 1217.)

Having a single set of recorded restrictions that apply to the entire subdivision would also no doubt fulfill the intent, expectations, and wishes of the parties and community as a whole. "One of the prime policy components of the law of equitable servitudes and real covenants is that of meeting the reasonable expectations of the parties and of the community." (French, *Toward a Modern Law of Servitudes: Reweaving the Ancient Strands, supra,* 55 So.Cal.L.Rev. at p. 1282, fn. 113.) A buyer need only know of the single document, not study the current labyrinthine system and try to predict how a later court would apply it to the contemplated purchase. The rule would also better enable the community to protect its interests. Here, for example, Woodside's approval of the Friars subdivision was conditioned on the town attorney's review of the CC&R's. Thus the community was able to exercise oversight as to the original recorded declaration. But it is unrealistic to expect such oversight of all subsequent individual deeds. The community should be able to expect that restrictions it requires as a condition of approving the subdivision will take effect, and not run the risk that they will fall victim to careless deed drafting.

By requiring recordation before execution of the contract of sale, the rule would also be fair. All buyers could easily know exactly what they were

purchasing. (See *Riley, supra,* 17 Cal.3d at p. 512.) Title searches would be easier, requiring only a search of restrictions of record, not of all deeds to all properties in the subdivision. "The danger that subsequent purchasers might not be aware of restrictions in prior deeds, where the developer neglects to incorporate similar restrictions in later deeds, and where the obligation of the title searcher extends only to instruments in the direct chain of title, can be easily avoided by insistence that the developer follow a simple procedure. Where a tract index is in effect, a plan of the proposed development should be recorded against the entire tract, which would give notice to all purchasers by placing the restriction in the direct chain of title to each lot in the tract." (Newman & Losey, *Covenants Running with the Land, and Equitable Servitudes; Two Concepts, or One?, supra,* 21 Hastings L.J. at p. 1341, fn. omitted.) "The burden should be upon the developer to insert the covenant into the record in a way that it can be easily found. Recording a declaration of covenants covering the entire area or filing a map which referred to the covenants would be sufficient." (Berger, *A Policy Analysis of Promises Respecting the Use of Land, supra,* 55 Minn. L.Rev. at p. 202.) When a developer does follow this simple procedure, it should suffice; future buyers should be deemed to agree to the restrictions.

The rule is consistent with the rationale of the prior cases, and would undermine no legal or policy concerns expressed in those cases. The theoretical underpinning of the rule requiring the restrictions to be stated in the deeds is that a developer cannot unilaterally make an agreement. It takes two parties—in this case the seller and the buyer—to agree. Merely recording the restrictions does not create mutual servitudes. Rather, they "spring into existence" only upon an actual conveyance. (*Werner, supra,* 181 Cal. at p. 183; see also Rest.3d Property, Servitudes (Tent. Draft No. 1, Apr. 5, 1989) § 2.1, com. c., p. 7 ["Recording a declaration or plat setting out servitudes does not, by itself, create servitudes. So long as all the property covered by the declaration is in a single ownership, no servitude can arise. Only when the developer conveys a parcel subject to the declaration do the servitudes become effective."].) We agree with all this. The servitudes are not effective, that is, they do not "spring into existence," until an actual conveyance subject to them is made. The developer could modify or rescind any recorded restrictions before the first sale.

Some of the prior cases, however, simply assumed that the deeds must *expressly* refer to the restrictions to evidence the purchaser's intent and agreement. On the contrary, it is reasonable to conclude that property conveyed after the restrictions are recorded is subject to those restrictions even without further mention in the deed. "The issue in these cases is the

intent of the grantors and grantees at the time of the conveyance." (*Fig Garden Park etc. Assn.* v. *Assemi Corp., supra,* 233 Cal.App.3d at p. 1709.) This intent can be inferred from the recorded uniform plan. It is express on the part of the seller, implied on the part of the purchaser. The law may readily conclude that a purchaser who has constructive notice, and therefore knowledge, of the restrictions, takes the property with the understanding that it, as well as all other lots in the tract, is subject to the restrictions, and intends and agrees to accept their burdens and benefits, even if there is no additional documentation evidencing the intent at the time of the conveyance. "If future takers purchase a piece of property with notice of a restriction made by a predecessor, then, in the absence of duress or fraud, they may ordinarily be thought to have bargained for the property with the restriction in mind, and to have shown themselves willing to abide by it." (Rose, *Servitudes, Security, and Assent: Some Comments on Professors French and Reichman* (1982) 55 So.Cal.L.Rev. 1403, 1405.)

Even under the Andersons' interpretation, a buyer may often be subject to restrictions not referenced in the deed. If an earlier deed does reference the restrictions, they would be enforceable as between that earlier property and any property purchased later even if the later deed does not mention them. It is reasonable and logical to make them enforceable upon the actual conveyance even if no deed references them if the restrictions are recorded and apply to the entire development. The overall plan, and not individual deeds, should determine what restrictions are in effect, and between whom.

The necessity of a writing because of the "policy considerations" underlying the statute of frauds, a major concern in *Riley, supra,* 17 Cal.3d at page 510, is not implicated here. Both the recorded CC&R's and the conveyance that triggered them are in writing. There is "written evidence" of the restrictions, the "understanding of the parties" is "definite and clear," there is no need to rely "upon the uncertain recollection and testimony of interested witnesses," there is no "mere conjecture." (*Ibid.,* italics omitted.)[6]

For these reasons, we adopt the rule, and disapprove inconsistent language and holdings of other cases.

---

[6]Neither the CC&R's nor the deeds themselves were subscribed by the buyers. "We recognize that a deed poll such as used here and commonly throughout California does not satisfy the requirement of the statute of frauds that the written memorandum be subscribed by the party to be charged [when that party is the grantee.] (Civ. Code, § 1624; 1 Witkin, Summary of Cal. Law, *supra,* § 210.)" (*Riley, supra,* 17 Cal.3d at p. 511.) "Notwithstanding the lack of complete congruity of common conveyancing practice in the creation of so-called negative easements to the requirements of the statute of frauds," we did not require such subscription, although we did require a *writing* because of the policy considerations underlying the statute of frauds. (*Ibid.*)

The Andersons argue that because people have relied on the prior law, any new rule should apply prospectively only. We disagree. It is "the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation." (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 151 [181 Cal.Rptr. 784, 642 P.2d 1305], fn. omitted.) Significantly, the only holdings inconsistent with the rule are by intermediate appellate courts. (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 986 [258 Cal.Rptr. 592, 772 P.2d 1059].) The proposed new rule is fully consistent with the facts of both *Werner, supra,* 181 Cal. 174—where there was no recorded uniform plan at all—and *Riley, supra,* 17 Cal.3d 500—where the restrictions were recorded *after* the sale.

Some of the dicta of those cases have already been repudiated. The language in *Werner, supra,* 181 Cal. 174, and *Riley, supra,* 17 Cal.3d 500, that appears to require that the servitude be created by *deed* has been disregarded. (*Scaringe* v. *J. C. C. Enterprises, Inc., supra,* 205 Cal.App.3d at p. 1545; *Hudson Oil Co.* v. *Shortstop* (1980) 111 Cal.App.3d 488 [168 Cal.Rptr. 801] [servitude may be created by a lease].) As explained in *Hudson Oil Co.* v. *Shortstop, supra,* 111 Cal.App.3d at page 495, our decisions focused on the deeds because they were the only documents that existed in those cases from which the intent of the parties could be determined. We did not preclude creating servitudes in other types of documents, such as leases. If servitudes may be included in a lease, it is reasonable to conclude they may also be included in a prior recorded uniform plan of development.

The rule is consistent with the rationale that a covenant requires an agreement between buyer and seller, and not a unilateral action by the developer. We merely reject the unexamined assumption that the intent of the purchaser, and therefore the agreement itself, must be expressed in the deed rather than be implied from the purchase with knowledge of the recorded restrictions. Moreover, as discussed above, the current law is unclear, and at best gives rise to a confusing pattern of enforceability and nonenforceability that no one could have intended. Replacing chaos with certainty need not be reserved for the future only. In *Willard* v. *First Church of Christ, Scientist* (1972) 7 Cal.3d 473 [102 Cal.Rptr. 739, 498 P.2d 987], we overruled an old common law of property rule that had outlived its usefulness. "Willard contends that the old rule should nevertheless be applied in this case . . . because grantees and title insurers have relied upon it. He has not, however, presented any evidence to support this contention, and it is clear that the facts of this case do not demonstrate reliance on the old rule." (*Id.* at pp. 478-479, fn. omitted.)

The same is true here. Given current uncertainty in the cases, it would be unreasonable to conclude that the Andersons, or others, have bought property believing that restrictions of record were enforceable as to prior purchasers of property in the same subdivision whose deeds referenced the restrictions, no matter how vaguely, but not otherwise. Rather, the opposite is far more likely, that homeowners buy property in the expectation and intent that recorded mutual restrictions apply uniformly throughout the subdivision.

The rule is not inconsistent with the statutes regarding covenants that run with the land. Neither the current statutes nor the predecessor version of section 1468 directly answers the narrow question here of how a covenant is created. Although the Skywood Acres CC&R's are not enforceable as covenants under section 1462 and former section 1468, this is not because they were inadequately created but because they burden the property as well as benefit it (§ 1462), and are between a grantor and a grantee (§ 1468).

For these reasons, we see no reason to deviate from the general rule that our decisions operate retrospectively.[7]

### 4. Resolution of this Case

The CC&R's of this case were recorded before any of the parcels were sold, thus providing constructive notice to subsequent purchasers; they state an intent to establish a general plan for the subdivisions binding on all purchasers and their successors; and they describe the property they are to govern. Therefore, applying the rule to this case, the fact that the individual deeds do not reference them is not fatal to their enforceability. The superior court erred in finding otherwise, and in granting summary judgment for the Andersons.

Citizens argues that it should therefore prevail in the entire lawsuit and that we should direct the lower court to issue an injunction in its favor. This is premature. We have decided only the narrow issue before us on review. We express no opinion on any other issue in the case.

---

[7]The dissent criticizes the court in this regard, but would apparently apply its own rule retroactively. Exactly what that rule would be is never stated, but presumably it would at least prohibit the longstanding practice of recording CC&R's for a subdivision before the sale of the first parcel; and abrogate the "first deed only" theory whereby, if the first deed refers to the restrictions, they apply against a later deed even if that deed omits the restrictions. (See *ante*, pp. 360-361, 362.)

We also do not suggest that the method used to create the CC&R's of this case is the only valid way to do so.

### III. Disposition

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Baxter, J., George, J., and Werdegar, J., concurred.

**KENNARD, J.**— I dissent.

At issue in this case is the enforceabililty of a subdivision's land-use restrictions that are set forth in a "declaration" recorded by the subdivider of the land. The majority holds that the restrictions are enforceable against future land purchasers even though the subdivider transferred the lots by means of grant deeds that on their face conveyed a fee simple estate and made no reference to any restriction on the land conveyed. The majority's rule is a simple one, but simplicity is its only virtue. By adopting this rule, the majority blasts a gaping hole through the structure of real property law that has been painstakingly erected by the Legislature and by the courts over the past century.

Under California law, no restrictions on the use of land can be created unilaterally by a single landowner. To be enforceable, a restriction must result from an agreement between landowners or between a grantor and a grantee. The majority acknowledges the necessity of an agreement. Yet, the majority evades this requirement by holding that a purchaser/grantee "constructively agrees" to be bound by restrictions set forth in a declaration recorded by the subdivider/grantor, even though those restrictions are not mentioned in the unrestricted grant deed conveyed to the purchaser. To hold that parties can form an agreement based only on constructive intent, rather than actual, mutually shared intent, would be unusual in any context. In the context of the law governing the creation of land use restrictions and grant deeds, such a rule is not just unusual but foreclosed by statute.

To give certainty and stability to real property transactions, the Legislature has, by statute, established that a grant deed conveys the grantor's entire fee simple interest—the whole of the grantor's proverbial bundle of rights in the property. (Civ. Code, § 1105.)[1] In addition, as provided by statute, the grantor of a grant deed covenants that the grantor has made no other encumbrance or conveyance of the property conveyed. (§ 1113.) A subdivider who records a declaration of restrictions before conveying any lots continues to possess the entire fee simple after the declaration is recorded.

---

[1]Further undesignated statutory references are to the Civil Code.

When, as here, the subdivider then conveys each lot in the subdivision by a grant deed that makes no reference to any restrictions, under the statutes just mentioned the subdivider/grantor has in each case conveyed the entire fee simple in the lot to the grantee.

By reaching a contrary result, the majority undermines the previously unquestioned certainty, established by statute, that an unrestricted grant deed passes all of the grantor's rights in the property conveyed. Contrary to legislative mandate, the majority has now transformed grant deeds that on their face are unrestricted conveyances of the landowner's entire interest into deeds conveying only a portion of the landowner's interest.

The majority is also wrong in its view that a *declaration* of restrictions for a subdivision recorded before any lots are conveyed provides constructive notice to a subsequent grantee of one of the lots. Under the recording statutes, the only recorded documents that can provide constructive notice are written instruments *that themselves create or transfer property interests*. The majority concedes that the declaration does not create or transfer the restrictions it sets forth or any other property interest; it therefore follows that the declaration is ineffective as a means of constructive notice. Thus, contrary to the majority, the inclusion of the restrictions in a recorded declaration does not give prospective purchasers notice of those restrictions, nor does it transform a subsequent grant deed that fails to mention any restrictions into an agreement by the grantee to be bound by those restrictions.

Finally, in making its rule retroactive, the majority alters the enforceability of restrictions on the use of land that was conveyed long ago. Our decisions do not support giving retroactive effect to new rules when doing so will impair vested interests in real property. Because Californians have been creating subdivisions for at least 130 years, the majority's decision to make its new rule retroactive will revive land-use restrictions that, like the restrictions in this case, were unenforceable under the law as it existed before today, while at the same time erasing other land use restrictions on which landowners may have relied for generations.

I

BACKGROUND OF THIS LAWSUIT

Defendants Jared A. and Anne Anderson own two contiguous lots in the Town of Woodside, San Mateo County, that together comprise about four acres. One of these, a part of the Skywood subdivision, has been improved

with a single-family residence. The other, which is included in the Friars subdivision, is land under cultivation by the Andersons as a vineyard.

In April 1992, the Woodside Town Council granted the Andersons a conditional use permit authorizing them to produce up to 1,000 gallons of wine each year on their 2-parcel property. One month later, Citizens for Covenant Compliance, an unincorporated association made up of some of the Andersons' neighbors, brought this action on its own behalf and for certain individually named neighbors seeking to restore the Andersons' Friars lot to its pre-vineyard state and to enjoin the production and sale of wine at the Andersons' Skywood lot residence. According to the complaint, the grape-growing and winemaking activities, as well as the presence of seven llamas on the Andersons' property, are prohibited under covenants, conditions, and restrictions (hereafter CC&R's) governing the Skywood and Friars subdivisions. The individual plaintiffs, as owners of lots in the two subdivisions, assert that the restrictions of the CC&R's inure to the benefit of their properties and accordingly seek to enforce the restrictions.[2]

The trial court granted judgment for the Andersons based on these undisputed facts:

The subdividers of the Skywood tract, Joseph and Claire Stadler, parceled the land into 60 lots in the early 1950's. On June 5, 1958, the Stadlers recorded a declaration expressing their "desire to establish a general plan for the improvement" of the property and to subject the property to various "conditions, restrictions, and covenants," including a restriction on each lot in the Skywood subdivision limiting its use to "residential purposes only." The declaration described the CC&R's as "covenants running with the land" enforceable by the subdividers, their grantees or assigns, or successors in interest. On October 14, 1958, *by grant deed that did not refer to the CC&R's*, the Stadlers conveyed to Benjamin O. Herbert the lot that was later purchased by the Andersons.

The Friars subdivision is comprised of four lots. On May 10, 1977, its subdivider, Cowper-Hamilton Building, Inc., recorded a declaration of CC&R's describing the property as subject to "mutual equitable convenants and servitues for the protection and benefit of each property in [the] subdivision," and stating that each lot was to be used for residential purposes only and not for any "form of business, commercial, manufacturing, or storage" activity. In addition, the declaration stated that no animals other

---

[2]For convenience, I will hereafter refer to plaintiffs collectively as "Citizens" even though the unincorporated association itself claims no right to enforce the land-use restrictions.

than household pets or horses could be kept on the property. Two days later, by warranty deed, Cowper-Hamilton conveyed the first lot in the Friars tract to Ray and Nancy Gava. *That deed made no mention of any CC&R's or other land-use restrictions.* After several additional transfers, this lot was purchased by the Andersons at a foreclosure sale.

Thus, no deed in the Andersons' chain of title for either their Skywood lot or their Friars lot refers to any CC&R's. Moreover, no deed conveying *any lot in either subdivision* refers to the CC&R's.

Based on these facts, the trial court determined that the CC&R's set forth in the recorded declarations did not satisfy the requirements for either of the two recognized forms of enforceable land-use restrictions: "covenants running with the land" and "equitable servitudes." The trial court's reasoning was as follows: the CC&R declaration for the Skywood subdivision, which was subdivided in the 1950's, could not create enforceable "covenants running with the land" because the version of section 1468 (specifying the requirements for "covenants" to "run with the land") that was then in effect (Stats. 1905, ch. 450, § 1, p. 610) did not authorize the creation of such covenants between a grantor and a grantee. By 1977, when the CC&R's for the Friars subdivision were recorded, the Legislature had amended section 1468 to permit the creation of covenants running with the land between grantors and grantees; nonetheless, the Friars declaration did not meet the statutory requirement that the restrictions be particularly described in the deed or other similar instrument. Furthermore, the recorded declarations for the Skywood and the Friars subdivisions did not create "equitable servitudes" because, in the trial court's words, "there does not exist any deed or other written instrument which expresses the joint intent of the declarants under the Skywood CC&Rs [the Stadlers] or the declarant under the Friars CC&Rs [Cowper-Hamilton], on the one hand, and any grantee of a Skywood lot or any grantee of a Friars lot, on the other hand, that any such grantee's title would be subject to the CC&Rs for the benefit of other lots and that the lots of the declarants' subsequent grantees would be bound for the benefit of such grantee's lots. . . ." Accordingly, the trial court entered judgment for the Andersons. On Citizens' appeal, the Court of Appeal affirmed.

II

ENFORCEMENT OF LAND-USE RESTRICTIONS EITHER AS COVENANTS RUNNING WITH THE LAND OR AS EQUITABLE SERVITUDES

A. *Historical Development of the Dual Doctrines of Covenants Running With the Land and Equitable Servitudes*

English common law recognized the right of owners of neighboring land to enter into agreements to restrict the uses of their respective properties in

ways that were mutually beneficial to each. (See Note, *Covenants and Equitable Servitudes in California* (1978) 29 Hastings L.J. 545, 546.) When they did, their contracts were enforceable between them, but could not be enforced contractually against their successors in interest absent an assignment of rights by the contracting parties. (*Ibid.*) Eventually the English law courts recognized a need for continuing enforcement of promises respecting land use, and by the mid-16th century developed a rule of property law that permitted agreements by landowners restricting the use of real property to "run with the land" and bind future owners. (*Spencer's Case* (1583 Q.B.) 77 Eng.Rep. 72; 5 Powell on Real Property (1995) Covenants as to Use, § 670[2], p. 60-12.) Such an agreement, termed a "covenant running with the land," was enforceable against future landowners only if certain strict requirements were met. (5 Powell on Real Property, *supra*, § 673[2], p. 60-46 et seq.)

The extent to which these limitations restricted the enforcement in the English law courts of covenants to use or refrain from using land in a particular way led the English equity courts in the mid-19th century to develop the doctrine of "equitable servitudes" as an alternative means for enforcing land use restrictions known to a subsequent purchaser even though the precise requirements for covenants running with the land were not met. (*Tulk* v. *Moxhay* (1848 Ch.) 41 Eng. Rep. 1143; see 5 Powell on Real Property, *supra*, Covenants as to Use, § 670[2], pp. 60-7 to 60-9.)

In 1886, an American treatise on equity jurisprudence gave this explanation of equitable servitudes: " '[I]f the owner of land enters into a covenant concerning the land, concerning its uses, subjecting it to easements or personal servitudes and the like, and the land is afterwards conveyed or sold to one who has notice of the covenants, the grantee or purchaser will take the premises bound by the covenant, and will be . . . restrained from violating it; and it makes no difference whatever with respect to this liability in equity whether the covenant is or is not one which "in law runs with the land." ' " (2 Pomeroy, Equity Jurisprudence (2d ed. 1886) § 689, quoted in *Hunt* v. *Jones* (1906) 149 Cal. 297, 301 [86 P. 686].)

These dual concepts for enforcing private land use agreements either at law or in equity have survived into modern times. Under current California law, however, the differences between the two doctrines have been minimized by legislative changes to the statute governing covenants running with the land.

B. *Covenants and Servitudes in California*

Since 1872, California has permitted landowners to create "covenants running with the land" by meeting certain statutory requirements. (§ 1461

["The only covenants which run with the land are those specified in this title, and those which are incidental thereto."].)

Section 1460 describes covenants running with the land as follows: "Certain covenants, contained in grants of estates of real property, are appurtenant to such estates, and pass with them, so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee, in the same manner as if they had personally entered into them."

The requirements for covenants running with the land are set forth in section 1468. As originally enacted, that statute limited "covenants running with the land" to agreements "made by the owner of land with the owner of other land," and did not include agreements between a grantor and a grantee of the same land. (Stats. 1905, ch. 450, § 1, p. 610.)

Such grantor-grantee agreements to restrict land use were enforceable, however, as "equitable servitudes." (7 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1990) Covenants and Restrictions, § 22.1, pp. 527-528.) Indeed, in California, the doctrine of equitable servitudes has been used mainly to enforce such grantor-grantee agreements (*ibid.*), which often involve a uniform plan of restrictions for a tract of subdivided land (see *Marra* v. *Aetna Construction Co.* (1940) 15 Cal.2d 375, 378 [101 P.2d 490]). The leading case on equitable servitudes is this court's decision in *Werner* v. *Graham* (1919) 181 Cal. 174 [183 P. 945].

*Werner* explained how the conveyance of parcels in a subdivided tract caused equitable servitudes to spring into being: "It is undoubted that when the owner of a subdivided tract conveys the various parcels in the tract *by deeds containing appropriate language* imposing restrictions on each parcel as part of a general plan of restrictions common to all parcels and designed for their mutual benefit, mutual equitable servitudes are thereby created in favor of each parcel as against all the others." (*Werner* v. *Graham, supra,* 181 Cal. at p. 183, italics added.)

*Werner* was quick to point out, however, that the creation of an equitable servitude enforceable against future purchasers required an *agreement*: "[I]f the parties desire to create mutual rights in real property of the character of those claimed here they must say so, and must say it *in the only place where it can be given legal effect, namely, in the written instruments exchanged between them which constitute the final expression of their understanding.*" (*Werner* v. *Graham, supra,* 181 Cal. at p. 185, italics added.) *Werner* stated that the intent of the common grantor—the subdivider—was insufficient to create enforceable servitudes, noting that even though the grantor "has a

general plan of restrictions in mind . . . *it is not his intent that governs* [but] the *joint* intent" of the grantor and the grantees. (*Id.* at p. 184, italics added.)

Nearly 60 years later, we reiterated this understanding of equitable servitudes in *Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500, 510 [131 Cal.Rptr. 381, 551 P.2d 1213], in which we observed that the requirement of a written *agreement* is " 'supported by every consideration of sound public policy which has led to the enactment and enforcement of statutes of frauds in every English-speaking commonwealth.' [Citation.]" This requirement is satisfied by the inclusion of the restrictions in a deed: "Equitable servitudes in land may be created in this state only by deed, and the expectations of the parties, reasonable or otherwise, are wholly without relevance in the absence of language in the deed having the legal effect of creating such a servitude." ( *Id.* at p. 512.)

Whereas traditionally the doctrine of covenants running with the land applied only to agreements between owners of separate properties and the doctrine of equitable servitudes served to enforce grantor-grantee agreements, in the late 1960's the Legislature amended section 1468 to make agreements between grantors and grantees enforceable as covenants running with the land. (Stats. 1968, ch. 680, § 1, p. 1377; Stats. 1969, ch. 245, § 1, p. 594.) Section 1468 thus has largely, if not completely, merged the doctrine of covenants running with the land and the doctrine of equitable servitudes in this state. (7 Miller & Starr, Current Law of Cal. Real Estate, *supra*, Covenants and Restrictions, § 22.1, pp. 530-531 [describing the 1968 and 1969 statutory changes as the "final statutory abrogation of the common-law restrictions against covenants running with the land" and stating that the doctrine of equitable servitudes now remains relevant only for determining the enforceability of restrictions predating the present code].)

III

THE MAJORITY'S HOLDING CONFLICTS WITH THE SETTLED REAL PROPERTY LAW OF CALIFORNIA

Under California law as it existed until today, the CC&R's contained in the declarations recorded for the Skywood and Friars subdivisions could not be enforced either as covenants running with the land or as equitable servitudes. In the 1950's when subdividers Joseph and Claire Stadler recorded the declaration for the Skywood subdivision, no enforceable "*covenants running with the land*" could be created between a grantor and grantee. And, although by 1977, when Cowper-Hamilton Building, Inc., recorded the CC&R declaration for the Friars subdivision, section 1468 permitted grantor-grantee "covenants running with the land," the Friars CC&R declaration

failed to meet the statutory requirement for *covenants running with the land* that the CC&R's be particularly described in a deed or other similar instrument. Nor were the CC&R's pertaining to the Skywood and Friars subdivisions enforceable as *equitable servitudes* because no reference was made to them in any deed.

The majority does not dispute that the Skywood and Friars CC&R's are not enforceable either as covenants running with the land or as equitable servitudes. Determined to enforce the land-use restrictions against the Andersons, the majority adopts this rule: "If a declaration establishing a common plan for the ownership of the property in a subdivision and containing restrictions upon the use of property as part of the common plan, is recorded before the execution of the contract of sale, describes the property it is to govern, and states that it is to bind all purchasers and their successors, subsequent purchasers who have constructive notice of the recorded declaration are deemed to intend and agree to be bound by, and to accept the benefits of, the common plan; the restrictions, therefore, are not unenforceable merely because they are not *additionally* cited in a deed or other document at the time of the sale." (Maj. opn., *ante*, at p. 349, original italics.)

In short, the majority holds that a landowner may unilaterally impose retrictions on purchasers and their successors by subdividing the land, recording a declaration that sets forth a common plan of CC&R's, and then conveying the lots in the subdivision, even though the conveyances are by means of grant deeds that on their face grant a fee simple estate and make no reference to any restriction upon the land conveyed. Although the future effect of the rule may well be beneficial because it will simplify the process for creating enforceable CC&R's throughout a subdivision, the rule is not one that this court may impose by judicial fiat. As I explain in the sections that follow, this court's establishment of a new method for creating enforceable CC&R's conflicts not only with common law principles of equitable servitude law but also with legislative enactments that this court lacks the power to disregard.

A. *The Majority Acknowledges the Need for Mutual Assent to Create Enforceable CC&R's, Yet Its New Rule Eliminates That Requirement*

The majority acknowledges that a subdivider of land "cannot unilaterally" impose enforceable land use restrictions on real property, and that "[i]t takes two parties—in this case the seller and buyer—to agree." (Maj. opn., *ante*, at p. 365.) Thus, as the majority states, "[m]erely recording the restrictions does not create mutual servitudes." (*Ibid.*)

Although the majority acknowledges the necessity for an agreement, the effect of the rule it creates is to dispense with that requirement. The majority asserts that "if the restrictions are recorded before the sale, the later purchaser is *deemed* to agree to them." (Maj. opn., *ante*, at p. 363, italics added.) The majority's conclusion, which substitutes a fictitious agreement for an actual agreement, does not withstand scrutiny.

By "deeming" the purchaser to have agreed to the restrictions by accepting an unrestricted grant deed from the subdivider that holds title in fee simple to the lot, the majority's rule does away with the well-established requirement of California law that the purchaser and the subdivider must actually agree to be bound by the CC&R's. (See *Werner* v. *Graham*, *supra*, 181 Cal. at p. 185; *Riley* v. *Bear Creek Planning Committee*, *supra*, 17 Cal.3d at pp. 510, 512.) The majority bases its "constructive agreement" theory on two premises, both of which are contrary to California's statutory law of real property.

The majority's first premise is that the recorded declaration containing the CC&R's is an instrument of which the purchaser, under the recording statutes, is deemed to have constructive notice. Its second premise is that, by accepting a fee simple grant deed that on its face has no restriction and does not mention the CC&R's, the purchaser who has constructive notice of the recorded CC&R's may be deemed as a matter of law to have agreed to be bound by the CC&R's. Both premises are wrong under California's statutory scheme governing real property.

First, a subdivider's declaration of CC&R's that is recorded before any parcels are sold does not meet the requirements of California's recording statutes pertaining to constructive notice. Section 1213 states that every "conveyance" of real property that is "recorded" as prescribed by law provides "constructive notice" of its contents to subsequent purchasers. But the term "conveyance" as defined in section 1215 refers only to a "written instrument" by which an "estate or interest in real property is created, aliened, mortgaged or incumbered, or . . . the title to . . . real property . . . affected . . . ." The term "written instrument" has a technical meaning under the recording statutes, which define it as "a written paper signed by a person or persons transferring the title to, or giving a lien on real property, or giving a right to a debt or duty." (Gov. Code, § 27279; see *Hoag* v. *Howard* (1880) 55 Cal. 564, 565 ["If we look into the provisions of the Code in which the word 'instrument' is used, it will be invariably found to indicate some written paper or instrument signed and delivered by one person to another, transferring the title to or creating a lien on property, or giving a

right to a debt or duty."].) Therefore, under section 1213, to establish a "conveyance" that, when "recorded," gives "constructive notice" of its contents to prospective purchasers, there must be a "written instrument" that either *creates or transfers an interest in real property from one person to another*. Conversely, recording some other document that does not itself create or transfer any interest in real property provides no constructive notice of its contents to prospective purchasers. (*Black* v. *Solano Co*. (1931) 114 Cal.App. 170, 173 [299 P. 843].)

A declaration of CC&R's is neither a conveyance nor a written instrument, for it does not "transfer" any title to real property (Gov. Code, § 27279) or "create[], alien[ate], mortgage[], or incumber[]" any interest in real property (§ 1215). Nor does *recordation* of a declaration effectuate a *transfer* or *creation* of an interest in real property. Indeed, as the majority concedes, the CC&R's never " 'spring into existence' until an actual conveyance subject to them is made," (maj. opn., *ante*, at p. 365) and "[m]erely recording the restrictions does not create mutual servitudes" (*ibid.*). Therefore, the recorded declaration of CC&R's for a subdivision does not provide constructive notice of the contents of the declaration to prospective purchasers. (*Black* v. *Solano Co.*, *supra*, 114 Cal.App. at p. 173.)[3] Accordingly, a purchaser who later signs a deed that makes no reference to the recorded declaration of CC&R's, and who thus has no actual or constructive notice of the restrictions contained therein, cannot be deemed to agree to be bound by the CC&R's.

Because the majority's rule permits CC&R's to "spring into existence" without an agreement, the rule does exactly what the majority says it does not (maj. opn., *ante*, at p. 365): it allows for the *unilateral* creation of enforceable land use restrictions, contrary to established law.

Furthermore, even assuming that a prior recorded declaration of CC&R's gave a purchaser constructive notice of those CC&R's, that purchaser cannot be presumed to constructively agree to be bound by them by accepting a fee simple grant deed that contains no reference whatsoever to the CC&R's. Indeed, under the pertinent statutory scheme, a contrary presumption arises from the subdivider's use of an unrestricted grant deed, as I shall explain.

Under section 1105, a grant deed passes the entire fee simple unless the deed itself evidences an intention to grant a lesser interest in the property. (§ 1105 ["A fee simple title is presumed to be intended to pass by a grant of real property, unless it appears from the grant that a lesser estate was

---

[3]I do not suggest, of course, that subdividers are precluded from *recording* a declaration of CC&R's so long as the recordation is permitted under the recording statutes.

intended."]; *City of Long Beach* v. *Marshall* (1938) 11 Cal.2d 609, 613 [82 P.2d 362].) By giving the purchaser a grant deed without restrictions, the subdivider conveys the entire interest held by the subdivider in the lot, free of any CC&R's or other restrictions that the subdivider may have intended to reserve in favor of the retained land; the subdivider cannot give an unrestricted grant deed while reserving the property interest described by the CC&R's. (*Ibid.*; *American Enterprise, Inc.* v. *Van Winkle* (1952) 39 Cal.2d 210, 220 [246 P.2d 935] ["In the absence of some exception, limitation or reservation, a grant deed is presumed to convey the grantor's entire interest."]; *Schwenn* v. *Kaye* (1984) 155 Cal.App.3d 949, 952 [202 Cal.Rptr. 374] [same].) Accordingly, if the subdivider gives every purchaser an unrestricted grant deed, as occurred in each of the subdivisions here, then each purchaser receives the subdivider's entire interest in the lot purchased and the restrictions never come into existence.

This court has long recognized that under section 1105 an *unrestricted* grant deed conveys the grantor's entire interest. In *Taylor* v. *Avila* (1917) 175 Cal. 203, 206 [165 P. 533] this court quoted the language of section 1105 and then stated: "The rule that a grant, bargain, and sale deed operates to pass the title in fee, unless it contains *in itself* some limitation, exception, or reservation, and that it estops the grantor thereafter from claiming any right or estate in the land so conveyed, is too well settled to require citation of authority. We find in the above deed no limitation or qualification whatever upon the fee-simple estate granted. The plaintiff, having made such conveyance, is estopped from asserting that it did not convey the entire estate in the land described." (Italics added.)

This court has continued to adhere to the view that enforceable restrictions cannot arise if the deed fails to refer to the existence of any restrictions: "[E]quitable servitudes restricting the free use of land may be created only by a deed setting forth the restriction (or referring to a recorded declaration of restrictions) . . . ." (*Riley* v. *Bear Creek Planning Committee, supra,* 17 Cal.3d 500, 512, fn. 7.) "[T]he expectations of the parties, reasonable or otherwise, are wholly without relevance in the absence of *language in the deed* having the legal effect of creating such a servitude." (*Id.* at p. 512, italics added; accord, Rest.3d Property, Servitudes (Tent. Draft No. 1, Apr. 5, 1989) § 2.1, com. c., p. 7; *id.,* § 2.14, com. a, pp. 3-5.)

In this case, the subdividers of the Skywood and Friars lots now owned by the Andersons gave *unrestricted* grant deeds to those lots and to every other lot in those subdivisions. Under section 1105 and under the decisions I have discussed in the three paragraphs preceding this one, the subdividers thereby

conveyed, and evidenced their intention to convey, their entire estates in those lots, free of any encumbrances. The majority's assertion that the subdividers and their purchasers intended to convey title encumbered by the CC&R's is contrary to this settled law. Accordingly, Citizens, in asserting interests derived from the subdivider, is "estopped from asserting that [the subdividers] did not convey the entire estate in the land described" in the deeds. (*Taylor* v. *Avila, supra,* 175 Cal. at p. 206.)

The majority attempts to minimize the difference between a grant deed that contains restrictions and one that does not, by noting that a grant deed may incorporate restrictions by express reference. (Maj. opn., *ante,* at pp. 359-360.) But the difference is a fundamental one under our statutory scheme governing conveyances of land: It is the difference between an agreement to convey the entire fee simple and an agreement to convey a lesser interest. According to the majority, the *unrestricted* grant deed of the first lot sold by a grantor/subdivider reserves in favor of the grantor a servitude defined by the restrictions in the CC&R declaration. Under section 1105, however, any limitation on the interest conveyed by a grant deed must be expressly stated in the deed. Thus, to reserve an interest in the grantor's favor, the deed must contain *some* expression of that reservation, even if nothing more than an express incorporation by reference. Just as parol evidence is inadmissible to show that an unrestricted grant deed was intended to convey less than the grantor's entire interest in the property (*Winchester* v. *Winchester* (1917) 175 Cal. 391, 394 [165 P. 965]; *Riley* v. *Bear Creek Planning Committee, supra,* 17 Cal.3d 500, 512, fn. 7), so too a prior recorded CC&R declaration that lacks the essential attributes of a conveyance is ineffective to limit the property interest conveyed by an unrestricted grant deed.

The majority's rule violates not only section 1105, but also section 1113, which lists implied covenants that are made a part of every grant deed and that are based upon the principle that a grant deed conveys the grantor's entire interest in the granted property. Section 1113 provides that, "unless restrained by express terms contained in such conveyance," the grantor covenants "[t]hat such estate is . . . free from encumbrances done, made, or suffered by the grantor." (See also *Hotaling* v. *Hotaling* (1924) 193 Cal. 368, 379 [224 P. 455, 56 A.L.R. 734].) Any restriction on the use of property "limiting the right of the owner of land to freely use it in any lawful way," such as covenants running with the land, equitable servitudes, or the CC&R's at issue in this case, is an "encumbrance" within the meaning of section 1113. (*Fraser* v. *Bentel* (1911) 161 Cal. 390, 394 [119 P. 509].)

As a result of the majority's rule, section 1113 will now be routinely breached by subdividers. This is because subdividers who convey all their

lots by means of unrestricted grant deeds will *not* be conveying property that is "free from encumbrances done, made, or suffered by the grantor" (§ 1113), for the property they are conveying is encumbered by CC&R's. The majority does not even acknowledge that its rule results in subdividers' breaching their deed covenants.

The legislative policy that grantors who use an unrestricted grant deed to convey title thereby convey the entire estate is so strong that even when the grantor partially or wholly lacks title at the time of conveyance, any interest in the conveyed property that the grantor later acquires passes immediately to the grantee by operation of statute. (§ 1106; *Schwenn* v. *Kaye, supra,* 155 Cal.App.3d at pp. 951-953.) "[T]he doctrine of after-acquired title applies even if the grantee had knowledge of the deficiency." (*Schwenn* v. *Kaye, supra,* 155 Cal.App.3d at p. 953.) Because even after-acquired interests pass from the grantor to the grantee under an unrestricted grant deed, it makes no sense to suggest, as the majority does, that interests held by the grantor at the time of the conveyance do not so pass.

B. *The Majority's Rule Violates the Statutory Requirement That Covenants Running With the Land Be Embodied in an "Instrument"*

The majority states that under its rule CC&R's are enforceable throughout a subdivision not only as equitable servitudes but also as covenants running with the land. (Maj. opn., *ante,* at p. 354.) But under section 1468, restrictive covenants will run with the land and bind future landowners only if they are set forth in a recorded "instrument."

Section 1468 provides that covenants "to do or refrain from" some activity will run with the land *if* certain conditions are met.[4] One condition is recordation of an "instrument containing such covenants." (*Id.,* subd. (d).) Therefore, to come within the statute, the recorded document setting forth

---

[4]Section 1468 provides in relevant part:

"Each covenant, made by an owner of land with the owner of other land or made by a grantor of land with the grantee of land conveyed, or made by the grantee of land conveyed with the grantor thereof, to do or refrain from doing some act on his own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee, runs with both the land owned by or granted to the covenantor and the land owned by or granted to the covenantee and shall, except as provided by Section 1466, or as specifically provided in the instrument creating such covenant, and notwithstanding the provisions of Section 1465, benefit or be binding upon each successive owner, during his ownership, of any portion of such land affected thereby and upon each person having any interest therein derived through any owner thereof where all of the following requirements are met:

"(a) The land of the covenantor which is to be affected by such covenants, and the land of covenantee to be benefited, are particularly described in the instrument containing such covenants;

the CC&R's must be an "instrument." As I have already explained, the term "instrument" in the context of real property is a document that either transfers or creates an interest in real property. (*Ante*, at pp. 377-378.) A deed conveying an interest in real property qualifies as an instrument, but a declaration conveying no interest at all does not. Only by ignoring section 1468's clear and unequivocal requirement that CC&R's be set forth in an "instrument" can the majority reach the conclusion that CC&R's contained in a recorded declaration "run with the land." .

IV

ALTHOUGH THE LEGISLATURE COULD BY STATUTE EXEMPT SUBDIVISION CC&R'S FROM THE GENERAL LAW, THIS COURT LACKS THAT POWER

As I have explained at the outset, in California covenants running with the land are a form of property interest created by statute, whereas equitable servitudes are a nonstatutory form of property interest created by courts acting in their common law capacity. Although this court can expand, contract, or even alter the basic premises of equitable servitude law, its power to do so is limited by the fundamental requirement that whatever changes it makes must not conflict with existing real property statutory law. More specifically, equitable servitudes are subject to the same statutes regarding constructive notice of recorded instruments and the interests conveyed by an unrestricted grant deed that govern every other form of real property interest in California.

Here, the majority devises a rule that makes CC&R's enforceable throughout a subdivision once the subdivider records a declaration describing a common plan of CC&R's and thereafter conveys one subdivision lot. As I have explained, however, the majority's "constructive notice" rationale fails because section 1213 does not include a recorded declaration of CC&R's among the instruments that give prospective purchasers constructive notice of their contents. Moreover, the majority's rule cannot be reconciled with the deed covenant provisions of sections 1105 and 1113. Because of these statutory conflicts, this court lacks the power to adopt the rule it does.

---

"(b) Such successive owners of the land are in such instrument expressed to be bound thereby for the benefit of the land owned by, granted by, or granted to the covenantee;

"(c) Each such act relates to the use, repair, maintenance or improvement of, or payment of taxes and assessments on, such land or some part thereof, or if the land owned by or granted to each consists of undivided interests in the same parcel or parcels, the suspension of the right of partition or sale in lieu of partition for a period which is reasonable in relation to the purpose of the covenant;

"(d) The instrument containing such covenants is recorded in the office of the recorder of each county in which such land or some part thereof is situated."

The Legislature, however, could, if it wished to do so, enact a CC&R rule specific to subdivisions that would exempt the creation of subdivision CC&R's from these general statutory provisions and authorize the creation of enforceable subdivision CC&R's when a subdivider records a declaration of CC&R's. A model for such a statute is section 1354 (part of the Davis-Stirling Common Interest Development Act [§ 1350 et seq.]), which applies exclusively to condominium projects and other common interest developments. (See *Nahrstedt* v. *Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361 [33 Cal.Rptr.2d 63, 878 P.2d 1275].) Section 1354 permits a developer to create CC&R's that are "enforceable equitable servitudes," by recording a declaration for the development setting forth the CC&R's. Although our statutes generally do not permit restrictions set forth only in a recorded declaration and not included in any deed to be enforced as equitable servitudes, the Legislature has, through section 1354, made an exception to this general rule in the case of common interest developments. It is a settled principle of statutory construction that a specific statute enacted by the Legislature to cover a particular subject "controls and takes priority over a general statute encompassing the same subject." (*Estate of Kramme* (1978) 20 Cal.3d 567, 576 [143 Cal.Rptr. 542, 573 P.2d 1369]; accord, *Howard* v. *Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 445 [41 Cal.Rptr.2d 362, 895 P.2d 469]; *San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 577 [7 Cal.Rptr.2d 245, 828 P.2d 147].) Or, in the words of Code of Civil Procedure section 1859, when a general statute conflicts with a particular statute, "the latter is paramount to the former." Thus, the power to exempt the creation of subdivision CC&R's from the general statutory law rests with the Legislature, not this court.

V

RETROACTIVE APPLICATION OF THE MAJORITY'S RULE, WHICH IMPAIRS VESTED RIGHTS IN REAL PROPERTY, IS CONTRARY TO SETTLED LAW

The majority makes its new rule fully retroactive. In general, " 'a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation.' [Citation.]" (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58].) There are exceptions to this general rule, however, when fairness or public policy considerations dictate against giving a decision by this court full retroactivity. (*Ibid.*) " 'For example, where . . . contracts have been made or property rights acquired in accordance with the prior decision, neither will contracts be invalidated nor will vested rights be impaired by applying the new rule retroactively.' [Citation.]" (*Ibid.*; accord, *Estate of Propst* (1990) 50 Cal.3d 448, 462-463 [268 Cal.Rptr. 114, 788 P.2d 628].)

The majority refuses to apply this exception here, even though giving retroactive effect to today's holding will seriously impair vested rights in real property. According to the majority, retroactivity is justified for this reason: "Given current uncertainty in the cases, it would be unreasonable to conclude that the Andersons, or others, have bought property believing that the restrictions of record were enforceable as to prior purchasers of property in the same subdivision whose deeds referenced the restrictions, no matter how vaguely, but not otherwise. Rather, the opposite is far more likely, that homeowners buy property in the expectation and intent that recorded mutual restrictions apply uniformly throughout a subdivision." (Maj. opn., *ante*, at p. 368.) I am not persuaded.

Before today's decision, anyone contemplating the purchase of a subdivided lot could rely on existing law that mere recordation, by the subdivider, of a declaration specifying land use restrictions was insufficient to create enforceable restrictions throughout the entire subdivision unless referenced in at least one deed conveying a lot in the subdivision. In this respect, as I have discussed earlier, the law was certain and settled. Thus, contrary to the majority's assertion, it is far more likely that purchasers in a subdivision would have relied on then-settled law rather than on the new rule announced by the majority today.

Also pertinent to the issue of retroactivity is the financial impact today's decision will have on those landowners who, like the Andersons, relied on their vested rights in the full unrestricted use of their land in deciding what use to make of that land. Instructive in this regard are decisions by this court declining to apply changes in zoning or building permit laws to property owners when to do so would result in a divestment of property rights already acted upon. (See *City of West Hollywood* v. *Beverly Towers, Inc.* (1991) 52 Cal.3d 1184 [278 Cal.Rptr. 375, 805 P.2d 329]; *San Diego Coast Regional Com.* v. *See The Sea, Limited* (1973) 9 Cal.3d 888 [109 Cal.Rptr. 377, 513 P.2d 129].) The majority does not even consider these decisions.

It is clear that retroactive application of the majority's new rule will revive land use restrictions that were *unenforceable* under the law as it existed before today. What is less clear is whether giving retroactive effect to today's holding will also destroy CC&R's that previously were *enforceable*; there is an internal conflict in the majority opinion on this point.

First, the majority claims that "uncertainties" in the law of servitudes "can be eliminated by adopting [its new] rule" that a subdivider's recording of a

declaration of CC&R's and later conveyance of one lot in the subdivision by a deed that does not mention the restrictions creates enforceable land-use restrictions binding upon all the lots in the subdivision. (Maj. opn., *ante*, at p. 363.) Later, however, the majority states that the rule it adopts is not the exclusive method for creating valid CC&R's in subdivisions. (Maj. opn., *ante*, at p. 368, fn. 7.) The majority cannot have it both ways: Either the majority's new rule is now the exclusive means of creating subdivision CC&R's or the majority has not eliminated the "uncertainties" in the existing law of servitudes.

The "uncertainties" to which the majority refers are those stemming from a conflict in two lines of cases, one applying the "first deed only" rule (holding restrictions would be binding in a subdivision on lots conveyed after the first deed containing the restrictions) and the other applying the "all first deeds" rule (holding that the restrictions could be enforced only if they appeared in all first deeds conveying lots in a subdivision). (Maj. opn., *ante*, at pp. 360-363.)[5] Under the majority's new rule, this conflict is irrelevant in those situations where a subdivider has recorded a declaration containing a common plan of restrictions for the subdivision; the CC&R's will now be enforceable even though they appear in *no* deed for *any* lot in the subdivision. But what happens in situations where the subdivider has not recorded a declaration, and instead has included the restrictions either in the first deed only or in all first deeds for the subdivision? Although the majority does not explain how its rule applies in those situations, I see two possibilities.

If we take the majority at its word that it has actually *eliminated* the "uncertainties" in the present law, the majority must have resolved the "first deed only"/ "all first deeds" case law conflict by today adopting a "declaration only" rule, making the enforceability of CC&R's in a subdivision depend in every case solely on whether the subdivider has recorded a

---

[5]As one commentator has observed, California law "is not clear" whether it is sufficient to reference the restrictions in the first deed to the first lot conveyed in the subdivision ("first deed only") or whether the restrictions must appear in the first deed conveying each of the lots in the subdivision ("all first deeds"). (7 Miller & Starr, Current Law of Cal. Real Estate, *supra*, Covenants and Restrictions, § 22.8, pp. 549-550; compare *Riley* v. *Bear Creek Planning Committee*, *supra*, 17 Cal.3d at p. 507 ["From the recordation of the first deed which effectively imposes restrictions on the land conveyed and that retained by the common grantor, the restrictions are binding upon all subsequent grantees of parcels so affected who take with notice notwithstanding that similar clauses have been omitted from their deeds."] with *Wing* v. *Forest Lawn Cemetery Assn.* (1940) 15 Cal.2d 472, 482 [101 P.2d 1099, 130 A.L.R. 120] [" 'To create an equitable servitude in the grant of lands in a large area it is essential that there must be a general scheme of restrictions . . . . The restrictions must not only appear in one deed, but in all the deeds . . . .' [Citations.]"].)

declaration setting forth a uniform plan of restrictions. If that is the case, a common plan of restrictions will be enforceable only in those subdivisions with *recorded declarations*, and will not be enforceable in subdivisions where the plan of restrictions appears not in the subdivider's recorded declaration but in one or more grant deeds for individual lots. Accordingly, CC&R's that have long been enforceable will now, as the result of the majority's retroactivity holding, become unenforceable.

If, on the other hand, the majority means to limit the retroactive application of its new rule only to subdivisions with a recorded declaration of restrictions (which is what the majority implies when it states that the new rule is not the exclusive method for creating valid CC&R's), then the majority has not, as it claims, eliminated the "uncertainties" caused by the "first deed only"/ "all first deeds" conflict in our case law.

In any event, because of its retroactive application, the majority's new rule will have widespread effect on all subdivisions, large and small. The majority states that its rule applies only to "subdivisions," thereby implying that its rule will be limited to planned communities and tract housing developments. But in California it is a fact of life that most privately owned property is located in subdivisions, for California law provides that virtually every division of land into lots constitutes a subdivision. Under the Subdivision Map Act (Gov. Code, § 66410 et seq.), a subdivision is created by any "division . . . of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease or financing, whether immediate or future." (Gov. Code, § 66424.) Thus, a 100-acre tract of single-family homes built by a developer is a "subdivision," as is a half-acre parcel divided into 4 lots by a landowner who plans to sell the lots off one by one over time; the majority's rule applies in either situation.

The practice of subdividing land in some parts of California dates back at least as far as the 1860's, when state statutes governed the mapping of subdivided lands in some cities and towns. (Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) Legislative History, § 1.2, p. 3 [citing Stats. 1867-1868, ch. 331, pertaining to San Francisco subdivisions].) By 1893, however, the Legislature had enacted a map act that applied to "subdivisions of lands into small lots or tracts for the purpose of sale" throughout the state. (Cal. Subdivision Map Act Practice, *supra*, Legislative History, at p. 2.)

Because in this state virtually every division of land into lots is a subdivision and Californians have been subdividing land for at least 130

years, the number of subdivision lots in California must number in the multiples of thousands. If the subdivider of any of these thousands of lots recorded a plan of common restrictions for the lots but conveyed the lots by unrestricted grant deeds, retroactive application of the majority's new rule will now bring those restrictions to life regardless of how long they have lain dormant.

## CONCLUSION

Before today, the CC&R's contained in the declarations recorded by the subdividers of the Skywood and Friars subdivisions but not included in any deed were unenforceable against the Andersons, regardless of whether one applied the "first deed only" or the "all first deeds" rule. This was the conclusion reached by the trial court and by the Court of Appeal, and with which I fully agree.[6]

As I have shown, the majority is wrong in its holding that enforceable land-use restrictions are created when a subdivider records a declaration of restrictions and then conveys lots by grant deeds that make no reference to any restrictions. This holding results in the enforceability of restrictions that violate our statutes and common law rules because:

1. The grantee has not actually assented to the restrictions.

2. The grantee lacks constructive notice of the declaration under the recording statutes.

3. The lots have been conveyed by unrestricted grant deeds.

4. The restrictions violate the grantor's statutory covenant against encumbrances.

5. The restrictions have not been created by a written instrument that satisfies the statute governing covenants running with the land.

---

[6]It makes no sense for the majority to state that the dissent "would apparently apply its own rule retroactively." (Maj. opn., *ante*, at p. 368, fn. 7.) Retroactivity is irrelevant when a court resolves a case under settled law—as I have done here. The majority is also wrong when it states that I would "abrogate the 'first deed only' theory." (*Ibid.*) I have no reason to choose between the "first deed only" and "all first deeds" theories in this case, in which the CC&R's do not appear in *any* deed.

And, by making its rule retroactive, the majority aggravates its assault on real property law by upsetting the vested rights of current landowners, such as the Andersons, who in developing their land as a vineyard and winery and in keeping seven llamas, could have reasonably relied on existing law.

Because the majority's adoption of the new rule is ill-considered, unsupported, and contrary to statute, I would affirm the judgment of the Court of Appeal, which in turn affirmed the judgment of the trial court.

The petition of defendants and appellants for a rehearing was denied March 28, 1996. Kennard, J., was of the opinion that the petition should be granted.