In re Jack METZGER, Debtor.

Ken Doolittle, Plaintiff,

v.

County of Santa Cruz, William "Jack" Metzger, Nusan Development Company, L.P., and Does 1 to 20, Defendants,

County of Santa Cruz, a political subdivision of the State of California; and the People of the State of California, Cross–Complainants,

v.

Jack Metzger, aka William J. Metzger, individually and as general partner of the Courtside Affair, a limited partnership, and as general partner of Jad Development Company, Ken Doolittle, Monterey Bay Securities, Inc., Monterey Bay Investments Corporation, Harold S. Sanders, aka Hal Sanders, and Does 1 Through 100, Inclusive, Cross–Defendants.

Bankruptcy No. 03–54106–ASW.
Adversary No. 03–5482.

United States Bankruptcy Court, N.D. California.

Aug. 2, 2006.

Lars T. Fuller, The Fuller Law Firm, San Jose, CA, for Debtor.

**MEMORANDUM DECISION ON CROSS–MOTIONS FOR SUMMARY ADJUDICATION BY KEN DOOLITTLE AND THE COUNTY OF SANTA CRUZ**

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court are cross-motions for summary adjudication brought by Ken

Doolittle ("Doolittle") and the County of Santa Cruz ("the County").

## I. INTRODUCTION

In July 1992 this Court issued an Order Authorizing Sale Free and Clear of Liens ("the 1992 Sale Order") by Aptos Courtside Affair, L.P. ("Courtside") to Nusan Development Company ("Nusan"). The property sold pursuant to the Sale Order was at the time raw land in Santa Cruz County (the "Property") and Courtside was a chapter 11 debtor. Doolittle loaned Nusan the funds for the purchase of the Property in July 1992, foreclosed on his deed of trust in 2000, and now owns the Property. Doolittle and the County disagree about the effect of the 1992 Sale Order.

## II. JURISDICTION

■ This Adversary Proceeding was removed to this Court on Doolittle's motion under 28 U.S.C. §§ 1441, 1452 and Bankruptcy Rule 9027. This Court has jurisdiction of this action under 28 U.S.C. 1334(b) as a matter related to this chapter 13 case under the test of *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.1984), which has been adopted by the Ninth Circuit. *In re Fietz*, 852 F.2d 455 (9th Cir.1988). The debtor in this case, Jack Metzger, was the general partner of Courtside and was a partner in Nusan; he is a defendant in the action removed from state court. The outcome of these cross-motions could alter Metzger's rights, liabilities, options, or freedom of action (either positively or negatively) and will in some way impact this estate. *Pacor*, at 994; *Fietz*, at 457.

■ As noted above, the parties' dispute focuses on the effect of the 1992 Sale Order. This Court has jurisdiction to interpret its own orders. *In re Franklin*, 802 F.2d 324, 326 (9th Cir.1986)(court retains jurisdiction to construe its own or-

ders); *In re Taylor*, 884 F.2d 478, 481 (9th Cir.1989) (court retains jurisdiction to interpret orders entered prior to dismissal of underlying case); *In re Aheong*, 276 B.R. 233 (9th Cir. BAP 2002) (court retains ancillary jurisdiction after case is closed).

## III. BACKGROUND

In 1985, the County issued development permits for the Property based, in part, on an affordable housing restriction contained in a recorded Participation Agreement between the County and Courtside ("the Participation Agreement").

The Participation Agreement required that twenty-five of the townhouses were to be sold at market rates ("the market rate units") and four were restricted as to the price at which they could be sold and to whom they could be sold ("the below market rate units"). The market rate units had been built and sold by 2000.

Nusan defaulted on its loan from Doolittle and Doolittle acquired the Property (then consisting only of the four below market rate units) by credit bidding at his foreclosure sale of the Property.

It is extraordinary to be asked to revisit the 1992 Sale Order 14 years after the Court issued it. The delay in seeking this relief is explained by the length of time it took Nusan to develop the Property—from 1992 to 2000—and the ensuing litigation between Doolittle and the County which began in 2000 and was removed to this Court in 2003. Plus, Doolittle, the plaintiff in this Adversary Proceeding, first acquired the property in 2000. The fact that Doolittle himself filed bankruptcy in September 2005 also delayed the progress of the case.

## IV. THE PARTIES' CONTENTIONS

The County contends that the 1992 Sale Order did not eliminate the affordable

housing restriction on the four units, because the County was not given any notice of the hearing at which the sale was approved and it asserts that it would have objected if it had known that Courtside was trying to eliminate its interest.

The County also claims that (i) its interest could not be eliminated under § 363(f)(1) because applicable non-bankruptcy law does not permit a sale free and clear of its particular kind of interest; (ii) the sale could not eliminate its interest under Bankruptcy Code § 363(f)(5) because it could not have been compelled to accept a money satisfaction of its interest; and (iii) equitable factors weigh in its favor because it detrimentally relied on what it was told by the parties involved with the development of the Property and that Nusan actually developed the Property according to permits premised on the County's affordable housing restriction.

Doolittle acknowledges that the County was not given formal notice of the hearing at which Courtside obtained approval for the sale to Nusan. Nevertheless, Doolittle contends that the 1992 Sale Order divested the Property of the County's affordable housing restriction because the County had actual knowledge of the Courtside bankruptcy case and allegedly had been told that the Property was going to be sold free and clear of the County's interest. He also argues that the County was on inquiry notice such that its failure to act (*e.g.*, by filing a request for special notice or by reviewing the Court's file) amounted to consent to the sale—freeing the Property of its interest.

Doolittle also argues that Bankruptcy Code § 363(f)(1) and § 363(f)(5) permit

sale free and clear of the County's interest and it is too late to challenge the sale under Rule 60(b).

## V. RELIEF REQUESTED

The County seeks a declaration that the 1992 Sale Order did not divest the Property of its interest and an order remanding this matter to state court so it may proceed to trial there. Doolittle seeks a declaration that the 1992 Sale Order divested the Property of the County's interest.

## VI. FACTS

The pertinent facts, taken from the parties' Requests for Judicial Notice, deposition excerpts and documents produced in discovery, all of which have been submitted in support of their cross-motions, are as follows. These facts are not disputed.[1]

1. In January 1985, the County entered into a Participation Agreement with Courtside through which Courtside agreed to participate in the County's program to provide affordable housing in the development of a twenty-nine unit townhouse project. Courtside agreed to develop four of the twenty-nine townhouses as affordable housing as defined in the Participation Agreement. The permit from the County to develop what was then raw land was premised in part on this restriction. The Participation Agreement restricts the resale of the units by price and by grantee.

2. The Participation Agreement was recorded on July 19, 1985. It was junior to a deed of trust in favor of Mt. Whitney Savings & Loan, Courtside's lender for its purchase of the Property ("Mt. Whitney").

---

1. The parties rely on the Declaration of Jason M. Heath in support of the County's motion for summary adjudication which attaches as exhibits documents and deposition excerpts, the Declaration of David Beck in support of Doolittle's motion for summary adjudication and the Declaration of David Beck in opposition to the County's motion—both of which attach deposition excerpts and background documents.

3. The Participation Agreement provides, *inter alia:* "the terms, covenants and conditions of this agreement shall apply to, and shall bind, the heirs, successors, executors, ... and grantees of both parties and shall be covenants running with the land. Acceptance of any deed to Property constitutes acceptance of the covenants contained herein."

4. No development of the Property took place between 1985 and 1987. Courtside and Mt. Whitney had a dispute regarding Mt. Whitney's loan to Courtside and were in litigation regarding the loan. Courtside filed its chapter 11 case in 1987. Mt. Whitney was taken over by Federal regulators (the "FDIC") in 1992.

5. The FDIC was actively involved in the Courtside bankruptcy case because its loan was in default and it had begun to foreclose on the Property.

6. During its chapter 11 case, Courtside proposed to sell the Property on five different occasions, and filed applications seeking court authority for these sales in April 1989, November 1989, June 1990, February 1991, and July 1992. The July 1992 sale was the only sale to be consummated.

7. The County was not served with any of the pleadings regarding the five sale attempts and does not appear on any of the certificates of service for any of the sale pleadings.

8. In March 1992, Nusan and Courtside entered into a Purchase Agreement (the "Purchase Agreement").

9. The Purchase Agreement, provides, *inter alia,* that (i) the seller will remove all monetary liens and (ii) the purchaser will subordinate a new construction deed of trust to any covenants, conditions and restrictions and/or any public utility easements reasonably required for the development of the Property.

10. The Purchase Agreement also gave the buyer time to review a title report and accept or reject any exception showing on the title report and time to do a feasibility study regarding the current development plans.

11. In March 1992, the County learned that the FDIC was in the process of foreclosing its deed of trust on the Property and started a proceeding which would have canceled the existing subdivision map (the "reversion to acreage" proceeding). If the County had completed this proceeding, no development would have been permitted under the existing subdivision map or plans.

12. The FDIC asked the County to postpone the reversion to acreage proceeding and the County agreed to do so. At the same time, the FDIC agreed to postpone its foreclosure sale so that Nusan could complete its purchase of the Property.

13. On April 28, 1992, Hal Sanders (on behalf of Nusan) and Jack Metzger (as general partner of Courtside) appeared at a hearing before the County Board of Supervisors to discuss the Property and the reversion to acreage proceeding.

14. According to the transcript of this hearing, Hal Sanders told the County: "I've been, uh, negotiating for the purchase of, uh, th—this Property, and, uh, uh, the, um, the, the bankruptcy of, um, uh, the company that owns the property right now has really helped things out and, uh, what we really want to do is, um, uh, finalize our negotiations, uh, with, with Courtside and with, uh, FDIC and, uh, continue with this project, uh, as it was laid out and, um, uh, by the end of the year, we'll have the uh, uh, the units in which will be—which will increase the County's tax base, we'll have the four BMRs and, uh, if, uh a reversed [sic] acre-

age, uh—I, I'm afraid it'll be years before, uh, anybody puts in anything there, uh, including the BMRs."

15. In May 1992, Jack Metzger, acting as the general partner of Courtside, executed and recorded an assignment of the Participation Agreement to Hal Sanders. Hal Sanders was at the time the secretary of Nusan Development Corp. which was the general partner of Nusan.

16. On July 7, 1992, Courtside filed an "Application for Authorization to Sell Real Property" and a "Notice of Hearing on Application for Authorization to Sell Real Property" (the "Application" and the "Notice"). The hearing was set for July 23, 1992. The Application is supported by the Declaration of Jack Metzger.

17. The County was not served with the Application or the Notice.

18. The Application recites, *inter alia,* that (1) Courtside seeks court approval to sell to Nusan all of its interest in the Property as described in the Purchase Agreement (a copy of which was attached and made a part of the Application) for $300,000; (2) the sale is to be free and clear of all "liens and encumbrances" pursuant to Bankruptcy Code section 363(f); and (3) the buyer will be purchasing the FDIC's note and deed of trust directly from the FDIC for $1 million in a separate transaction.

19. The Application also states that there are two deeds of trust on the Property, the first deed of trust held by the FDIC and the second deed of trust held by Hal Sanders and Cindy Murray. The Application says that both deed of trust holders consent to the sale: the FDIC consents on the condition that its note and deed of trust are purchased by the buyer.

The second deed of trust holders consent on the condition that the buyer assumes their deed of trust.

20. The Application is silent as to the County's affordable housing restriction. It does, however, say that the County's taxes would be paid from escrow.

21. On July 31, 1992, the Court issued its Order approving the sale to Nusan. The Order provides that the sale is "free and clear of all liens and encumbrances, pursuant to 11 U.S.C. section 363(f)."

22. According to the 1992 Sale Order, Nusan assumed the FDIC's first deed of trust, and paid $300,000 cash, used to (1) pay closing costs and taxes, (2) assume Hal Sanders' existing second deed of trust in the approximate amount of $192,000, (3) fund a new third deed of trust in favor of Courtside in the amount of approximately $24,000—which was to be subordinate to a new construction loan.[2]

23. Doolittle arranged the financing for Nusan's purchase of the Property. Pursuant to the "Loan and Security Agreement and Escrow Instructions" dated October 6, 1992 (the "Doolittle Loan Agreement" and the "Doolittle Loan"), Nusan borrowed $1.6 million from a group of lenders assembled by Doolittle.

24. The Doolittle Loan Agreement recites that the Doolittle Loan was secured by an assignment to Doolittle of the FDIC's note and first priority deed of trust on the Property.

25. On November 5, 1993, the California Department of Real Estate issued a Final Subdivision Public Report to Nusan. This Report says the project includes the below market rate units.

26. Nusan developed the Property between 1992 and 2000. In 2000, Nusan filed a chapter 7 bankruptcy case and the chap-

---

**2.** The terms of the deal described in the Doolittle Loan Agreement differ somewhat—but the difference is immaterial to this decision.

ter 7 trustee abandoned the estate's interest in the four below market rate units. Doolittle foreclosed on these four units in late 2000.

27. Following his foreclosure sale, Doolittle asked the County to release the units from the County's affordable housing restriction and the County refused. Doolittle then filed suit against the County and related parties[3] in the Superior Court for the County of Santa Cruz on January 25, 2001.

## VII. ISSUES

1. Whether the County's interest in the Property could have been eliminated under Bankruptcy Code § 363(f)(1) or (f)(5).

2. Whether Courtside's notice of the 1992 sale satisfied the County's due process rights.

3. Whether the County's actual knowledge of Courtside's bankruptcy case and intent to sell the Property put the County on inquiry notice equivalent in effect to formal notice.

## VIII. DISCUSSION

**1. Whether the County's Interest in the Property Could Have Been Eliminated under Bankruptcy Code § 363(f)(1) or (f)(5).**

Doolittle argues that the County's affordable housing restriction is a lien as defined in the Bankruptcy Code.[4] As a lien, the Property could be sold free and clear of it under § 363(f)(1) or (f)(5)[5].

Doolittle argues the County's interest could be removed in a sale under 363(f)(1) because the Participation Agreement did not create a covenant running with the land. At the time it was recorded the County was not a grantor or grantee or the owner of the Property, one of which is required under California law for the creation of a covenant. Civil Code §§ 1461, 1462, 1468. *Richland Calabasas, L.P. v. City of Calabasas*, 45 Fed.Appx. 661 (9th Cir.2002) (covenants purportedly created by development agreement ineffective when city neither owner, grantor nor grantee at time created).

Doolittle argues that the sale could have satisfied § 363(f)(5) because the County could have been compelled to accept a money satisfaction of its interest. He contends that, in effect, the County had a claim which could have been calculated by the difference between the sale price of each unit as restricted and as unrestricted.

At oral argument, the County conceded that the Participation Agreement did not satisfy California law for the creation of a covenant running with the land, acknowledging that its interest was subject to

---

3. Both Nusan and Jack Metzger are named as defendants in Doolittle's Second Amended Complaint. The County contends Doolittle's foreclosure sale was improper and seeks to have it set aside.

4. Bankruptcy Code § 101(37) defines lien as a "charge against or interest in property to secure payment of a debt or performance of an obligation." The Participation Agreement created an obligation in Courtside or its successors to perform in a specified manner and secured the performance of that obligation.

5. Under § 363(f), a debtor may sell property under § 363(b) free and clear of any interest if—

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in *bona fide* dispute;

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

removal under § 363(f)(1). The County still argues that § 363(f)(5) is inapplicable because it could not be compelled to accept a money satisfaction for its interest because it is not one that is reducible to a dollar amount.

There is conflicting authority regarding the treatment of interests such as the County's in the context of a § 363 sale. These decisions are, in large part, driven by their facts and applicable state law regarding real property. None of the cases cited by the County or Doolittle have facts identical to those before the Court. See generally, *In re WBQ Partnership*, 189 B.R. 97 (Bankr.E.D.Va.1995) (under Virginia law, agency's "recapture" rights that ran with the property were an interest that could be satisfied with money for purposes of § 363(f)(5) sale); *In re Arden & Howe Assoc. Ltd.*, 152 B.R. 971 (Bankr. E.D.Cal.1993) (under California law, restrictive use covenant in lease runs with land and binds successors in certain situations described in Civil Code § 1470; however, if debtor/lessor rejects lease, covenant fails and § 365(h)(2) preempts all state remedies for breach of restrictive use covenant); *Gouveia v. Tazbir*, 37 F.3d 295 (7th Cir.1994) (under Indiana law, restrictive covenant was not contractual, but was a property interest; in sale free and clear of liens under § 363(f)(5), holder could not be compelled to accept money in satisfaction of its interest); *In re 523 East Fifth*

*Street Housing Preservation Development Fund Corp.*, 79 B.R. 568 (Bankr.S.D.N.Y. 1987) (under New York law, city could not be compelled to accept money satisfaction under § 363(f)(5) of restrictive covenant regarding low income housing in its deed to ch. 11 debtor).

Whether the obligation is contractual in nature, and therefore personal as between the County and Courtside (and later, by the assignment, between the County and Nusan), or is a covenant running with the land, is a question which this Court does not need to reach for its decision.[6]

■ The narrow issue now before the Court is whether the notice of the hearing that led to the 1992 Sale Order comported with due process such that the Order divested the Property of the County's interest. For these purposes, the County had *an interest* in the Property at the time of the 1992 sale to Nusan sufficient to require that it receive notice of the hearing at which the Court was asked to approve a sale that Doolittle now claims stripped the Property of the County's interest.

## 2. Whether Courtside's Notice of the 1992 Sale Satisfied Due Process.

### A. Grounds and Procedure for Section 363 Sales

Selling real property free and clear of liens is routine in bankruptcy cases.[7]

---

6. Courtside's Chapter 11 counsel, James D. Sumner, testified at his deposition that the County's interest appeared on the Property's title report. See Declaration of Jason M. Heath in support of the County's motion for summary adjudication, Exhibit E, p. 150:5–151:11. This fact supports a conclusion that the County had an interest in the Property entitling it to notice of the sale. The California Supreme Court has described the area of the law dealing with covenants and servitudes as an "unspeakable quagmire." See *Citizens for Covenant Compliance v. Anderson*, 12

Cal.4th 345, 47 Cal.Rptr.2d 898, 906 P.2d 1314 (1995). See also Basil Mattingly, *Sale of Property of the Estate Free and Clear of Restrictions and Covenants in Bankruptcy*, 4 Am. Bankr.Inst. L.Rev. 431 (1996).

7. The applicable Code sections and Rules in effect in 1992 were, in relevant part, the same as the current version of these Code sections and Rules quoted in this decision. Sales are either "subject to" liens or "free and clear" of them. Here, the Property was not sold free and clear of the liens of the first or second priority deeds of trust. The first remained on

There is an established procedure for such sales. The process for obtaining approval is generally as follows:

After notice and a hearing a debtor may sell property of the estate outside the ordinary course of business.[8] Bankruptcy Code § 363(b)(1). Under § 363(f), a debtor may sell property free and clear of interests under certain conditions. The two conditions relevant here are in (f)(1)(applicable non-bankruptcy law permits sale free and clear of such interest) and (f)(5) (the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest).[9]

### B. *The Required Notice for a Section 363 Sale*

Rule 6004(a) implements § 363. It provides that notice of a proposed sale not in the ordinary course of business is to be given pursuant to Rule 2002(a)(2). Rule 2002(a)(2) in turn states that all parties in interest are to be given 20 days notice by mail of a proposed sale outside the ordinary course of business. Rule 2002(c) states that subject to Rule 6004, the notice of a proposed sale must include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections.

Rule 6004(c) provides that a motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens *or other interests* in the property to be sold. The notice required by Rule 6004(a) is to include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor. A motion is to be served in the manner of serving a summons and complaint by Rule 7004. Rule 9014(b).

 The party attempting service is responsible for proper service and bears the burden of proof that it has been accomplished. *In re Ex–Cel Concrete Co.,* 178 B.R. 198, 203 (9th Cir. BAP 1995). The party objecting to service has the burden of proving a *prima facie* error in service. *In re Webb,* 212 B.R. 320, 322 (8th Cir. BAP 1997); *In re Villar,* 317 B.R. 88, 94 (9th Cir. BAP 2004). The same due process and service requirements are applicable to both Bankruptcy Rules 7004 and 9014. *In re Zumbrun,* 88 B.R. 250, 252 (9th Cir. BAP 1988).

 These interrelated Code sections and Rules have been deliberately crafted to provide procedural assurance that a party holding or claiming an interest in real property in a debtor's estate will receive timely notice of the intention to sell specific property free and clear of liens. *Ex–Cel,* at 203. "The message to be derived from these rules is that notice is to be taken particularly seriously when liens are being affected in bankruptcy. Holders of liens that may be adversely affected are entitled to *unambiguous notice* and an adequate opportunity to reflect and to respond." *In re Loloee,* 241 B.R. 655, 662 (9th Cir. BAP 1999) (emphasis added).

---

the Property but the FDIC, as the beneficial owner, was replaced by Doolittle. The second, held by Hal Sanders, appears to have been assumed by Nusan. The only lien arguably removed from the Property was the County's.

8. Section 102(1) defines the phrase "after notice and a hearing" to mean after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances.

9. The County is an "entity" by the definition in § 101(15) and a "government unit" by definition in § 101(40). The parties' positions regarding whether the County's interest is subject to sale under 363(f)(1) or (f)(5) are discussed *supra.*

## C. *Defective Notice*

█ The County was not served with the Notice of the hearing or the Application. Accordingly, the Court did not have jurisdiction over the County and there is a *per se* jurisdictional defect in the Order. *Ex–Cel,* at 205 (no notice to secured creditor meant court lacked *in personam* jurisdiction to adjudicate creditor's property rights—order issued after sale had *per se* jurisdictional defect and was therefore void); *In re Center Wholesale, Inc.,* 759 F.2d 1440, 1448 (9th Cir.1985) (judgment may be set aside as void under Rule 60(b)(4) for a violation of the due process clause of the Fifth Amendment; one day's notice of hearing on use of cash collateral was inadequate); *In re Villar,* 317 B.R. 88 (9th Cir. BAP 2004). In *Ex–Cel,* the Ninth Circuit Bankruptcy Appellate Panel explained:

> the due process clause of the Fifth Amendment requires that notice be reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections. (Citation omitted). If the notice requirement of the due process clause is not satisfied, the order is void. (Citations omitted).

*Ex–Cel,* at 203.

The Ninth Circuit Bankruptcy Appellate Panel distinguished *In re Edwards,* 962 F.2d 641 (7th Cir.1992), the Seventh Circuit case upon which Doolittle relies:

> Based on the analysis in *Center Wholesale* (which dealt with unduly short notice), we conclude that the lack of any notice to [the lienholder] constituted constitutional lack of due process which could not confer *in personam* jurisdiction on the bankruptcy court to adjudi-

cate [the lienholder's] property rights. This was *per se* a jurisdictional defect sufficient to result in a void order. We therefore respectfully disagree with *Edwards* to the extent it allows considerations, such as the exigent needs of the bankruptcy system or the innocence or good faith of third parties involved in bankruptcy sales, to justify departures from due process standards in adjudicating property rights.

*Ex–Cel,* at 205.

█ Doolittle argues that *Edwards* supports a conclusion that sale orders are to be granted finality and can only be attacked by a motion under Rule 60(b) brought within a reasonable time.[10] Doolittle contends that the County is now precluded from bringing such a motion because more than a "reasonable time" has elapsed since the 1992 Sale Order. Doolittle is incorrect that there is a time limitation for a Rule 60(b)(4) motion. A motion to set aside a void judgment may be brought at any time and a void judgment cannot acquire validity because of laches. *Center Wholesale,* at 1448.

In *Edwards,* the Court approved a § 363 sale free and clear of liens to a *bona fide* purchaser and an arms' length lender had arranged the financing for the purchase. More than a year after the sale, a secured creditor, who had been omitted from the notice, argued that the sale order was void as to it under Rule 60(b)(4). In that context, the strong policy of finality in bankruptcy sales supported the conclusion that the sale should not be set aside. The Seventh Circuit concluded that even though notice was defective, the policy of finality controlled to protect the *bona fide* purchaser. *Edwards,* at 645.

---

**10.** Rule 60(b) says upon such terms as are just, the court may relieve a party from a final judgment for the following reasons: ... (4) the judgment is void.

If the reasoning in *Edwards* were used in the Ninth Circuit, it would not dictate a different result on these facts. Nusan was not a *bona fide* purchaser and Doolittle is not a *bona fide* purchaser equivalent to the one in *Edwards*. The Participation Agreement was assigned to Hal Sanders, a principal of Nusan, and it was recorded in May 1992. When Doolittle arranged the financing for Nusan's purchase from Courtside in 1992, he was on full notice of the Participation Agreement. There is no *bona fide* purchaser to protect here and there is no innocent intervening lender on these facts.[11]

### 3. Whether the County's Actual Knowledge of Courtside's Bankruptcy Case and Intent to Sell the Property Put the County on Inquiry Notice Equivalent in Effect to Formal Notice.

■ At oral argument, the County agreed that it knew of the Courtside bankruptcy case and that Courtside planned to sell the Property to Nusan, and of the proposed closing date for the sale. At oral argument, Doolittle conceded that the County did not have knowledge of the actual hearing date at which the sale was approved. The parties do not agree whether the County knew that Courtside intended the sale to remove the County's interest from the Property but, in the Court's view, resolution of that factual question is not dispositive since the County had no notice of the hearing on the 1992 sale.

■ There is, of course, a difference between actual knowledge of a bankruptcy case and actual knowledge of a hearing on a sale free and clear of liens. In theory, actual knowledge of a hearing may, in some circumstances, be sufficient to satisfy due process concerns. *Ex–Cel,* at 203 (actual notice or an *acceptable substitute* for procedural notice requirements may save order from constitutional due process concerns); *In re Gabel,* 61 B.R. 661 (Bankr. W.D.La.1985) (where secured creditor denied receiving formal notice, but had constructive notice through publication and actual knowledge of time and place of sale, court found implied consent to sale); *In re Shapiro,* 265 B.R. 373 (Bankr.E.D.N.Y. 2001) (party had actual notice because summons and complaint were mailed to its correct address rather than incorrect address in petition—due process satisfied).

■ The level of knowledge must be examined in each case to determine whether it rises to the level required to comport with due process. *In re Halux,* 665 F.2d 213, 216 (8th Cir.1981) (evidence of actual knowledge must be more substantial than discussion in general terms of possible auction at some undetermined future date); *Loloee,* at 662 (holders of liens that may be adversely affected are entitled to unambiguous notice and an adequate opportunity to reflect and respond); *Center Wholesale,* at 1448 (notice must fulfill due process requirements of timeliness and specificity and must be examined in light of the Code's statutory requirements, safeguards, and remedies).

Doolittle argues that the County knew *enough* to put it on inquiry notice and because the County failed to investigate the bankruptcy court's files or take any steps to protect itself, it may not now complain that the 1992 Order could not divest the County of its interest in the Property.

---

11. Doolittle argues that construction lenders made decisions on the basis that below market rate restriction had been eliminated by the 1992 sale but he offers no evidence to support this assertion. No such lender has intervened or sought to intervene in this Adversary Proceeding.

In support of his inquiry notice theory, Doolittle relies on *In re Gregory*, 705 F.2d 1118 (9th Cir.1983).[12] *Gregory* is a chapter 13 case and deals with the bar date for *unsecured* creditors to file claims. The rule in *Gregory*, and similar cases dealing with the claims bar date in chapter 7 and chapter 13 cases, is not controlling here. First, the issue here is not a claims bar date for an unsecured creditor. The issue is the appropriate notice of a sale that Doolittle claims was a valid sale free and clear of liens. Second, as explained below, the procedural and statutory differences between chapter 7 and chapter 13 cases, on the one hand, and chapter 11 cases on the other hand, give rise to different due process standards for certain bankruptcy events. Third, even in the claims bar date context, creditors in a chapter 11 case who have knowledge of the pending case have a right to assume that reasonable notice will be given before their claims are barred. *City of New York v. New York. New Haven & Hartford RR Co.*, 344 U.S. 293, 297, 73 S.Ct. 299, 97 L.Ed. 333 (1953). In a chapter 11 case, the creditor who is not given notice, even if he has actual knowledge of reorganization proceedings, does not have a duty to investigate and inject himself into the proceedings. *In re Maya Construction Co.*, 78 F.3d 1395, 1399 (9th Cir.1996).

In *Maya Construction*, the Ninth Circuit acknowledged that lack of formal notice of a claims bar date in a chapter 13 or chapter 7 case is less significant than it is in a chapter 11 case because a claims bar date is automatically set by the date of the section 341 meeting. A creditor who receives notice of the section 341 meeting is,

in effect, given notice of the claims bar date.

In *Gregory* (a chapter 13 case) and in *In re Coastal Alaska Lines, Inc.*, 920 F.2d 1428 (9th Cir.1990) (a chapter 7 case), the creditors had received actual notice of the section 341 meeting. Indeed, in *Gregory* the complaining unsecured creditor had received an order providing notice of the date, time, and location of the meeting of creditors stating that the creditors' meeting was scheduled for December 17, 1979 at 1:00 p.m. and that the confirmation hearing in the bankruptcy court would follow at 2:00 p.m. *Gregory*, 705 F.2d at 1119–20. The order also stated that "The debtors' plan does not propose payment of unsecured creditors." The creditor did not appear at the creditors' meeting or at the confirmation hearing. The bankruptcy court issued its order confirming the plan and the creditor did not appeal.

The facts in *Coastal Alaska* are more complicated than in *Gregory*. However, in that case the complaining creditor had received a copy of the first notice of creditors' meeting which stated that it appeared that there were no assets in the estate so creditors need not file claims at that time, but that if it later appeared that there were assets from which a dividend could be paid, the bankruptcy court would notify listed creditors and give them an opportunity to file their claims. The complaining creditor knew at that time that it had not been listed as a creditor and would not receive the statutory notice that would be sent if it turned out there was a reason to file claims. On these facts, the Ninth Circuit found that the creditor had been provided sufficient notice and a reasonable opportunity to appear as a creditor and

---

**12.** Even if the County had such a duty, a review of the pleadings regarding the five sale attempts would not have disclosed an intent to strip the Property of the affordable housing restriction. None of the sale applications addresses the County's interest or states that it will be removed by the sale.

receive statutory notice and that it had not acted reasonably in simply waiting to receive notice (that the estate had assets from which a dividend could be paid). The Court of Appeals held that due process did not require a separate notice of a claims bar date. This case sensibly holds that notice of the section 341 meeting is sufficient notice of the bar date for filing proofs of claim.[13]

There is no corresponding rule for inquiry notice in a chapter 11 case and no such rule for a sale free and clear of liens. The County had no duty to "inject itself" into the case. It was entitled to notice of a certain specificity affording it a certain amount of time to prepare for and appear at a hearing at which the court would be asked to rule on the elimination of its interest in the Property. There is no support for Doolittle's theory that the duty to give unambiguous notice of a sale free and clear of liens may be met by putting a party on inquiry notice.

Doolittle relies only on cases involving claims bar dates in chapter 7 and chapter 13 cases. The Court is aware of no case supporting this inquiry notice theory in a chapter 11 case involving a sale free and clear of liens. The Court concludes that inquiry notice does not exist in the context of the facts before this Court.

#### 4. *The Appropriate Remedy*

The Court has jurisdiction to review and modify or set aside its own orders. *Wayne United Gas Co. v. Owens–Illinois Glass Co.*, 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557 (1937) (court can set aside a sale order so long as proceedings have not terminated and no intervening rights have become vested which would be disturbed by modification or reconsideration of order); *Franklin*, 802 F.2d 324, 326

(9th Cir.1986) (court retains jurisdiction to construe its own orders); *Taylor*, 884 F.2d 478, 481 (9th Cir.1989) (court retains jurisdiction to interpret orders entered prior to dismissal of underlying case). A void order may be set aside at any time under Rule 60(b)(4). *Center Wholesale*, at 1448. Because the County did not have adequate notice of the hearing on the 1992 Sale Order, the Order is void as to the County's interest.

The Court has some flexibility in creating a remedy here and need not and will not find the entire sale void on these facts. *Center Wholesale*, at 1451 (cash collateral order void for inadequate notice, remedy available under § 507(b) preferable to setting aside cash collateral arrangement under which parties had performed); *Loloee*, at 663 (sale order void only to extent it purported to resolve priority dispute). The Court need only find, and does find, that the County's interest in the Property survived the sale to Nusan. The 1992 Sale Order is to that limited extent void because the County's due process rights were violated.

### IX. CONCLUSION

For the foregoing reasons, the Order is void as to the County's interest in the Property. The 1992 Sale Order is otherwise valid and fully enforceable. The County shall submit an order in accordance with this decision after review as to form by counsel for Doolittle. The County shall also submit a separate order providing for the remand of this matter to state court after review as to form by counsel for Doolittle.

---

13. Doolittle does not argue that the County received any section 341 notice or *any* documents in this case.